957 So.2d 757 (2007)
STATE of Louisiana
v.
Patrick KENNEDY.
No. 05-KA-1981.
Supreme Court of Louisiana.
May 22, 2007.
Rehearing Denied June 29, 2007.
*760 Jelpi Pierre Picou, Jr., New Orleans, G. Benjamin Cohen, Marcia Adele Widder, Adams & Reese, Martin A. Stern, Riva Sinha, New Orleans, for Appellant.
Charles C. Foti, Jr., Attorney General, Paul D. Connick, Jr., District Attorney, Terry Michael Boudreaux, Juliet Lee Clark, Assistant District Attorneys, for Appellee.
VICTORY, J.[*]
On May 7, 1998, Patrick Kennedy was indicted by a grand jury for the rape of his eight-year-old stepdaughter L.H.[1] on March 2, 1998, in violation of La. R.S. 14:42 (aggravated rape; victim under the age of 12), and the state subsequently gave notice of its intent to seek the death penalty.[2] The district court declared that the defendant was indigent and appointed counsel to represent him on June 23, 1998. After a vigorous pre-trial defense, during which defense counsel filed approximately 50 substantive motions and sought 6 supervisory writs,[3] a jury was selected on August 8 and 11-15, 2003. Opening statements commenced immediately after the completion of jury selection and trial continued through August 25, 2003, after which the jury returned a verdict of guilty of aggravated rape. The penalty phase was held on August 26, 2003, and the jury unanimously decided that the defendant should be sentenced to death. On October 2, 2003, the district court denied the defendant's motion for new trial, in which the defense contended that sentencing a defendant to death for an aggravated rape which the victim survives is constitutionally prohibited, and sentenced the defendant to death. The defendant appeals to this Court pursuant to La. Const. art. V, ง 5(D)(2), assigning 69 errors.

*761 FACTS AND PROCEDURAL HISTORY
It was not disputed that the victim was brutally raped. On the morning of March 2, 1998, the victim was transported by ambulance to Children's Hospital where she was examined in the emergency room. The victim's predominate injury was vaginal with profuse bleeding. Her entire perineum was torn and her rectum protruded into her vagina. Dr. Scott Benton of Children's Hospital testified as an expert in pediatric forensic medicine that the victim's injuries were the most serious he had seen, within his four years of practice, that resulted from a sexual assault. A pediatric surgeon was called in to repair the damage, which was repaired successfully.[4]
The evidence presented at trial centered around the identity of the defendant as the rapist. Alvin Arguello, chief dispatcher for A. Arpet Moving Co., the defendant's employer, testified that when he arrived for work on the morning of March 2, 1998, which was generally around 6:15 a.m., there was a message from the defendant indicating he would not be available to work that day. The defendant called Arguello again between 6:30 and 7:30 a.m., sounding nervous, to ask him how to get blood out of a white carpet because his stepdaughter[5] had "just become a young lady." Rodney Madere, owner of B & B Carpet Cleaning, testified at trial that the defendant, whom he identified by caller ID, called him at 7:37 a.m. on March 2 to schedule an urgent carpet cleaning job to remove bloodstains. The State introduced a photo of the caller ID box from B & B Carpet Cleaning showing a call from "Kennedy P" at 7:37 on March 2. Lester Theriot, an employee of B & B, testified that Madere called him before 8:00 on the morning of March 2, 1998, and told him to report immediately to the defendant's home, but he did not get there until after he dropped his son off at school, which he routinely did between 8:15 and 8:45. When he arrived, he could not get into the home because the police and an ambulance were present.[6]
At 9:18 in the morning on March 2, 1998, the defendant called 911 to report that his stepdaughter had just been raped. The 911 call was played for the jury.[7] The defendant advised the operator that his daughter was in the garage while he was getting his son ready for school and that he exited the residence after hearing loud screaming. He told the operator that he discovered the victim lying in the side yard between their house and the empty lot next door, and that she told him that two boys grabbed her, pushed her down, pulled her over there, and raped her. When the operator asked if they were white males or black males, the defendant responded, "Ms. May [the victim], was they black or white? She said they was black boys." He further told that operator that he had seen one of the boys "walking through this neighborhood all the time," and described him as 18 years old, wearing a black shirt and blue jeans, and riding a ten-speed bike.
Jefferson Parish Sheriff Office (JPSO) Deputy Michael Burgess responded first to the reported rape from only a block *762 away, arriving between 9:20 and 9:30. Deputy Burgess testified that he was so close to the crime scene when he got the call that he thought he would actually catch the rape in progress. In fact, the transcript of the 911 call indicates Burgess arrived at the scene while the defendant was still talking to 911. Burgess testified that he was confused when he arrived because the crime scene in the yard was inconsistent with a rape occurring there: there was a dog sleeping undisturbed nearby and a small patch of coagulated blood was found in otherwise undisturbed long grass. He did not see anyone fleeing on a bike.
Burgess testified that he heard voices from inside the house, approached the house through an open garage door, and proceeded through the garage to the back door. Inside the garage, he observed a straight thin line of blood drops on the concrete. The defendant came to the back door talking on the telephone, but ignored the officer as he tried to get information on the crime, continuing to talk on the phone. This prompted the officer to order the defendant to get off the phone and give him a description of the suspects so he could pursue them. Inside the house, Deputy Burgess did not see any more blood until they reached the stairs, which had a blood trail leading up them. Deputy Burgess testified that the defendant took him upstairs to the victim, who was lying sideways on the bed in her room, wearing a t-shirt, and wrapped in a bloody cargo blanket. The defendant was wiping his hands with a towel that had blood on it. When the officer asked where it came from, the defendant then told him he got the towel from the bathroom after he put the victim in the bathtub to clean her. The defendant told him further there was blood on the steps because he carried her up the stairs from the backyard like an infant. However, there was no blood on his own clothes and no blood trail from the circle of coagulated blood in the backyard.
Deputy Burgess testified he attempted to question the victim but she was only partially able to respond verbally to his questions at first. When Burgess questioned her, the defendant "kept trying to answer for her and [he] got a little upset with that." The victim told Burgess that she was selling Girl Scout cookies in the garage with her brother when two boys dragged her from the garage and one raped her.
Stephen Brown, EMS field supervisor for West Jefferson Medical Center, testified that he was in the ambulance that responded to the 911 call minutes later. He found the victim upstairs in the home, wearing a Pocahontas shirt, with her shorts pushed down around her ankles, and wrapped in a bloody cargo blanket. The defendant had a basin filled with water which he was using to wipe off the victim's genital area. The defendant told him he was wiping down the blood to see where the blood was coming from, at which point Brown directed him to stop. Brown then examined the victim and found she had blood oozing from her vaginal area, which he then covered with a pad.[8] Brown testified he attempted to interview the victim, but that the defendant interrupted the victim and tried to answer the questions for her.
Both Burgess and Brown testified that they considered the defendant's behavior to be atypical and ultimately suspicious.
*763 Detective Brian O'Cull, formerly of JPSO, testified that he interviewed the defendant at 10:18 a.m. on March 2, 1998, about an hour after the rape was reported and before the defendant was a suspect, and that the interview was recorded. Detective O'Cull identified an audiotape and transcripts of this interview, in which the defendant claims that he found the victim lying in the yard behind the house with her shorts half-way off in a puddle of blood, and that he then grabbed a work blanket, picked her up on it and brought her into the house, where he sat her in the tub with the water running while he called 911. The defendant claimed that the victim told him two boys were involved, and he saw a 19-year-old boy he recognized from the neighborhood ride off on a blue ten-speed bicycle "with the handle bars turned up," which he had seen on previous occasions behind the empty house next door. The defendant also told O'Cull that he had called the school earlier to report that the victim was staying home because she was sick.
Detective Mike Hullihan testified that the defendant was Mirandized and interviewed by police later that day at the police station, although he was not a suspect at that time. The defendant told him that his wife left for work at 5:30 in the morning, and that after he fixed the victim breakfast, she vomited in the bathroom. After she vomited a second time, he gave her orange juice mixed with Tylenol and called school to report that she would be absent. The defendant stated that he was upstairs cleaning when the victim's younger brother came and told him that the victim was sick and lying in the yard. When the defendant went to investigate, he saw a black male fleeing on a bicycle and found the victim crying and lying in the yard with her panties and shorts next to her. The defendant told the officers he wrapped the victim in a cargo blanket, carried her upstairs, put her in the bathtub and called 911. The defendant described the attacker as a black male, about 250-270 pounds, wearing blue jeans and a black t-shirt, with a fade haircut and wearing a gold earring in his left ear, and fleeing on a light blue 10-speed bicycle with "upwards handle bars" on it. After taking the defendant to several locations in an effort to locate a bicycle similar to the one he described, the defendant identified one on display at K-Mart and pointed to the light blue cap on a laundry detergent bottle as being the same color as the bike. Det. Hullihan testified that he was surprised that the defendant picked out this bike as a similar bike. A picture of this bike, which was not a ten-speed with handle bars turned up as earlier described by the defendant, but was instead a regular bike with straight handlebars, was introduced into evidence.
Sergeant Kelly Jones of the JPSO Personal Violence Division was lead investigator on the case. When she arrived at the defendant's home on March 2, she instructed the other officers to begin canvassing the neighborhood to look for the suspect and bike as described by the defendant.[9] In the side yard, she noticed a location in the grass which appeared to contain coagulated blood but the grass was not disturbed and she could not locate any blood leading away from this location. She observed four or five very small drops of blood on the concrete floor just inside the garage and several random small drops of blood leading up the stairs. She collected several items from the victim's bedroom, including the utility blanket she had been lying upon, the t-shirt she was *764 wearing, a pair of black shorts and underpants, and a blood-stained towel.
Sergeant Jones then interviewed the victim at the hospital. The victim was in pain and described her attacker as a black male, age 18-19, medium build, with muscular arms. Sergeant Jones testified that the defendant was present during the interview and prompted the victim to include that the attacker had an earring and noted that they had seen the attacker cutting grass in the neighborhood previously. Sergeant Jones also testified that the defendant described the attacker as over 6' tall, large but not fat, with muscular arms, and described the bicycle as a blue 10-speed with curled racing-style handlebars.
On March 3, Detective Florida Bradstreet interviewed defendant in connection with her discovery of a bike belonging to Devon Oatis behind a nearby apartment on Longleaf Lane in Harvey. The blue, gearless, bicycle was found in tall grass and was described by Det. Bradstreet as covered with spider webs, rusted, with flat tires, and inoperable. It appeared to have been there for some time as the grass underneath it was indented and dead. The defendant positively identified the bicycle as the one on which he saw the subject ride away and stated that he saw this bike behind the house on Sunday evening. Contrary to the defendant's earlier description of the bike, before he identified a similar bicycle at K-Mart, this bicycle was not a ten-speed with handle bars turned up, but was a regular bicycle with straight handlebars. The defendant described the bicycle's rider to Det. Bradstreet as a husky individual of 260 to 280 pounds, but that he did not have "fat hanging." Later, the defendant described the suspect to Det. Bradstreet as 18-19 with a muscular build, a low fade haircut and a gold earring in his left ear.
After the defendant identified the bike that belonged to Devon Oatis, Sergeant Jones interviewed Oatis, a 16-year-old male, who was 6'11" tall and 270-280 pounds and appeared as being very heavy set. Sergeant Jones testified that she interviewed Oatis, a juvenile, in the presence of his mother. They both gave statements, which Sergeant Jones determined to be false by investigating further at John Ehret High School.[10] However, Sergeant Jones testified that Oatis was ruled out as a suspect because his physical description did not match those given by the victim and the defendant and because his bicycle was inoperable.
In the meantime, the victim continued to claim that two boys on a bicycle pulled her from the garage and one of them raped her in the yard. Dr. Benton testified that when he first examined the victim at Children's Hospital, she reported to him that two boys took her from the garage and one raped her while the other watched. Dr. Benton testified that medical records showed that the victim told all hospital personnel this same version of the rape while she was at the hospital, but that she told one family member that the defendant raped her. In addition, several days after the rape, the victim was interviewed by psychologist Barbara McDermott, and the videotaped interview was *765 introduced by the defense at trial.[11] In this interview, lasting for three hours over two days, the victim said that she woke up, watched television, and ate breakfast, which was prepared by the defendant, whom she called "Daddy." The victim said she was playing in the garage with her brother when she was approached by a boy who asked her about Girl Scout cookies. After a long delay, she said she fell off a ledge at the end of the garage and the boy pulled her by the legs across the concrete into the neighbor's yard with the other boy following them. She was trying to grab the grass while he was dragging her. The boy then pulled down his pants and her shorts, placed his hand over her mouth, and "stuck his thing in [her]." She could not go anywhere because he was on top of her and the other boy was behind her. When another boy saw the defendant through the window, they both fled on a bicycle. She forgot what both boys looked like and did not remember what either boy had on, though she thought one had on a black shirt and blue jeans. She did not remember anything after that until the ambulance arrived. Dr. McDermott questions the victim thoroughly and argumentatively on each element of the victim's story, telling the victim that her story does not make sense. For example, Dr. McDermott asks the victim why she did not suffer abrasions from being dragged across concrete by her legs, and asks her why she did not scream if the attacker's hand was not placed over her mouth until they reached the neighboring yard.
In spite of the victim's version of events as stated above, the focus of the investigation began to shift toward the defendant. On March 4, 1998, the police found out for the first time about the defendant's phone calls to his employer, A. Arpet Moving Co., hours before he made the 911 call, telling Arguella that he would not be into work and asking him how to get blood out of a white carpet because his step-daughter "had just become a young lady." Sergeant Darryl Monie testified that on March 4, the defendant evidently knew the police had this information, and explained that he called his employer at about 5:15 a.m. to report that he was available for work that day. However, the defendant told him he called his employer back after the police had arrived at his house, first to inform him that he could not come to work because "his little girl had become a young lady," and then later because she had been raped. The defendant also told Sergeant Monie that he sought advice in the first phone call on removing bloodstains from carpet.
*766 On March 9, 1998, the police also found out about the defendant's call to B & B Carpet Cleaning, after Mr. Madere contacted them after seeing blood-stained carpets being removed from the defendant's home on the televised news. As stated earlier, the defendant made this call at 7:27 a.m., almost two hours before the defendant claimed the victim had just been raped, to request an urgent carpet cleaning job to remove blood stains.[12] The defendant was arrested and charged with aggravated rape on March 10, 1998.
The State relied heavily on the testimony of Mr. Madere and Mr. Arguello because it created a time line indicating that the rape did not occur as reported by the defendant, i.e., that the rape occurred much earlier in the morning than reported by the defendant, that the defendant waited several hours before calling 911, and that the defendant was apparently attempting to clean up evidence of the crime in the meantime. The police also became aware of physical evidence that the crime scene had actually been cleaned.
Sergeant Jones testified that pursuant to search warrants issued on March 4, 5, 7, and 8, 1998, luminol testing of areas in the victim's home presumptively established the presence of blood in a large area of the carpet at the foot of the victim's bed, on the carpet pad and on the subfloor beneath. Sergeant Jones testified that a stain was observed on the subfloor following the removal of the carpet and padding. The police also found a one gallon jug container labeled "SEC Steam Low Foam Extraction Cleaner" found in the garage, and a pail and two towels from the bathroom sink. The police also discovered a stain on the underside of the victim's mattress and mattress pad, which they initially believed indicated defendant had altered the crime scene by turning over the mattress. Sergeant Charles Durel of the JPSO Crime Lab identified his sketches and photographs of the home, which showed the presumptive locations of blood visualized with luminol. Samples of several of these items from these locations were subsequently tested by Drs. Henry Lee and Michael Adamowicz of the Connecticut State Police Forensic Science Lab in 1998. Dr. Lee testified that liquid dilution demonstrated that someone had attempted to clean some bloodstains from some of the carpet samples. Dr. Adamowicz tested samples of a mattress pad and carpet and a vaginal swab of the victim. Dr. Adamowicz found no DNA on the mattress. He found otherwise unidentifiable human DNA on the carpet. He found the victim's DNA on some carpet samples, the cargo blanket, a towel, and a sanitary napkin. However, the defense had the mattress pad tested by Dr. Carolyn Van Winkle, senior forensic biologist at the Tarrant County Medical Examiner's Lab, who testified that she re-tested the same mattress pad in 2001 using a more sensitive test that came into common usage after 1998, and absolutely could rule out the victim as the source of blood on the mattress pad.
Dr. Lee also testified as an expert in serology, DNA, crime scene analysis and reconstruction, and general criminalistics. Dr. Lee found no semen in the victim's shorts. No seminal fluid or spermatozoa was found in any of the swabs taken from the victim at the hospital. Because of the *767 lack of positive evidence related to the defendant, the bulk of Dr. Lee's testimony was devoted to discussing the absence of evidence that might confirm the defense's theory that the victim was raped in the yard as she initially stated. He stated that he examined the shirt and shorts the victim was wearing for any grass or soil stains but could not find any, indicating that the victim was not dragged through the grass as she initially claimed. He also did not find any abrasion marks consistent with being dragged. He opined that blood staining on the back of the victim's shorts was consistent with the shorts being placed on the victim after she was raped. He also examined the victim's underwear and found a blood transfer stain on the back of them and did not find any grass or soil stains on them. He examined photographs of the crime scene outside and found nothing to indicate that a struggle had taken place, as there were no depressions in the grass and only a small blood stain sitting on top of the grass, indicating a low-velocity dripping, suggesting that the blood had been planted there.
Finally, and most important for the State was the testimony of the victim, supported by the testimony of her mother, C.H.C.H. testified at trial that she married the defendant in 1998. After the rape, the victim was removed from her custody for approximately one month because she had permitted the defendant, who was in jail, to maintain phone contact with the victim. C.H. testified that soon after the victim was returned to her custody, the victim for the first time reported to her that defendant had raped her.[13] She testified that the victim was in the room she shared with her younger brother, crying as her mother had never seen her cry before. After she allowed the victim to come sleep in her room, the victim told her that she could not hold it in anymore and that the defendant was the one who raped her.
The victim, who was eight when raped and nearly fourteen years old at the time of trial, took the stand during the fifth day of testimony. Upon taking the stand, one of the prosecuting attorneys stepped out of the courtroom for a few minutes. Defense counsel objected that the victim was permitted to sit on the stand during this delay and cry while the jury watched. The defense approached the bench to move for a mistrial, which motion was denied. After some brief questions about her age, the State asked "Do you remember what happened to you in 1998," to which the victim answered "yes." When asked to tell what happened, the victim stated "I woke up one morning and Patrick was on top of me and." She evidently then lost her composure, which required the court to recess, at which time the defense again moved for, and was denied, a mistrial.
During that recess, out of the presence of the jury and in a discussion at the bench, pursuant to a joint stipulation, the state offered a videotaped interview performed on December 16, 1999, at the Child Advocacy Center (CAC) by Amalee Gordon. After the recess ended, the victim testified that she was interviewed by Amalee Gordon on December 16, 1999. The state then formally offered the videotaped interview into evidence and offered to stipulate that the tape was edited to satisfy the rules of evidence and that the tape in fact satisfied all of the statutory requirements that were previously discussed with defense counsel at the bench.[14] Defense *768 counsel formally accepted the stipulation, stating "We would agree with that stipulation, Your Honor, and we have no objection to the tape." Although the videotape was offered into evidence after the victim lost her composure on the stand upon accusing the defendant, it is apparent that both parties knew from the outset of trial that the videotape would be introduced into evidence, as defense counsel asked the jury during opening statements to watch this tape closely and compare it with the first videotape made in March of 1998, in which the victim accuses two boys of dragging her out of her garage and one of them raping her.
The videotape was played at that time for the jury while the victim remained seated on the stand. After the tape was played for the jury, the defense approached the bench and again moved for a mistrial on the basis that, while the tape was played (for approximately 23 or 24 minutes), the jury could observe the victim crying as she watched the tape. This motion was denied.[15]
This videotape has been reviewed and is briefly summarized as follows. The victim and the interviewer sit in chairs against the backdrop of a quilt. The interviewer notes that Sergeant Kelly Jones is also present working the equipment and on one occasion points to the quilt, implying that Sergeant Jones is behind it. The interviewer informs the victim that she is present because something happened to her and asks whether she knows what that is, to which the victim responds that she was raped by Patrick Kennedy. The victim states that she woke up one morning and the defendant was on top of her. He raped her, saw that she was bleeding, and called the police after informing her that she had better tell them the story he made up. The victim could not recall what that story was. The interviewer probes for additional details and the victim can state only (over the course of about fifteen minutes) that it happened in her room, on the bed, with the defendant's hand covering her eyes, while her shorts were off and the defendant was naked. The victim draws her bed showing the location the rape occurred and identifies her and the defendant's "private parts" on male and female outline drawings as the only place (with the exception of his hand over her eyes) that the defendant touched her. The defendant did not make her do anything else or say anything else to her. After she was raped, the victim said she fainted and did not remember anything until the ambulance arrived to take her to the hospital. At the hospital, other people asked her questions. She could not remember what they asked her other than for her birth date. The victim knew that she had bled and recalled seeing blood on her bed but nowhere else. This video was crudely edited to excerpt only admissible portions of the victim's statements.[16]
After this videotape was played, the victim remained on the stand and testified on *769 direct and cross-examination. Her testimony in full is as follows:
By Mr. Paciera:
Q. You're alright?
A. Yes.
Q. Okay, when we looked at that tape, that was I think from December of 1999. You were a lot younger then?
A. Yes.
Q. And that was almost a year and a half after this happened to you, is that right?
A. Yes.
Q. So when this happened to you, you were even smaller and younger?
A. Yes.
Q. When this first happened to you, you said somebody else did this, do you remember?
A. Yes.
Q. Do you remember what you said?
A. Yes.
[Defense object to leading questions and judge admonishes]
Q. When this first happened, what did you say happened?
A. I said two black boys raped me.
. . .
Q. Did two black boys do this to you?
A. No.
Q. Were you outside at all when this happened to you?
A. No.
Q. Were you ever in the garage when this happened to you?
A. No.
Q. Were you ever downstairs in the house when this happened to you?
A. No.
Q. After this happened to you, did you ever go downstairs?
A. No.
Q. Who told you about saying two boys did it?
A. Patrick.
. . .
Q. Who was home the day this happened?
A. Me, my brother and Patrick.
Q. And where had your Mom gone?
A. To work.
Q. Was it still early morning or midday or do you remember what time this happened?
A. Morning.
Q. After this happened to you, what did Patrick do?
A. He got up, I'm not sure where he went, but he left my room and he came back.
Q. Did he have anything when he came back?
A. No.
Q. Was he carrying anything?
A. No.
Q. Okay, was there some point when he came in and he was carrying anything?
A. Yes.
Q. What was he carrying?
A. A cup of orange juice and pills chopped up in it.
Q. And what did he do with the orange juice with the chopped up pills?
A. He gave it to me.
Q. Now, after this happened to you, did it injure you, did you bleed? Not the orange juice, when you were raped.
A. Yes.
Q. Did you bleed?
A. Yes.
Q. Did anyone ever clean you?
A. No.
Q. When you said Patrick, he left your room, is that what you said?

*770 A. Yes.
Q. And could you tell where he was or could you hear him?
A. Not when he left the first time.
Q. Okay, well, could you hear some other time?
A. Yes.
Q. What could you hear?
A. I heard when he was on the phone with his boss.
Q. What'd he tell his boss?
A. He told his boss that his daughter had became a young lady and he couldn't come in today.
Q. Did you stay in the bedroom the whole time after this happened until the police got there orโ
A. No.
Q. What happened?
A. I was throwing up and he carried me to the bathroom.
Q. Were you throwing up after he did this?
A. Yes.
Q. And when he brought you into the bathroom, what bathroom did he bring you into?
A. In the hall bathroom.
Q. Did you throw up anymore?
A. I threw up in the tub.
Q. How did you get back to your bedroom after that?
A. I don't remember.
Q. You don't remember? Do you remember either the police getting to your house or somebody else like a doctor kind of person getting to your house?
A. I remember the police coming.
Q. How did you feel when the police came? Okay, I'll ask another question. Did you talk to the police?
A. While I was in the room?
Q. What's that?
A. While I was in the room?
Q. While you were in the room, if you remember.
A. I don't remember.
Q. Do you remember going to the hospital?
A. Yes.
Q. Do you remember how you got to the hospital?
A. Yes.
Q. How did you get to the hospital?
A. In the ambulance.
Q. Do you remember being at the hospital? You, okay, do you remember being at the hospital?
A. Yes.
Q. Do you remember talking to any doctors at the hospital?
A. Yes.
Q. Did anybody tell you what they were going to have to do to help you?
A. Yes.
Q. And what did they tell you or what did they do to help you?
A. While I was in the hospital?
Q. Yes.
A. When I first got there?
Q. We don't have to be real specific but did the doctors do some kind of surgery on you?
A. I don't know.
Q. Did they give you medicine?
A. Yes.
Q. Did it put you to sleep?
A. Yes.
Q. The person, Patrick that you said did this to you, I want you to point to him right now.
Mr. Paciera: Please let the record reflect that the witness is pointing to the defendant, Patrick Kennedy.

*771 Q. Is everything that you're saying in this courtroom today the truth?
A. Yes.
Q. Did you hear yourself when you were on that tape from December of 1999?
A. Yes.
Q. Is everything you heard on there the truth?
A. Yes.
Q. That this person raped you?
A. Yes.
Q. Nobody else?
A. Nobody else.
Q. In your room?
A. In my room.
Q. Thank you, [L.H.]. I want you to answer this lady's questions.
On cross-examination, the victim testified that she remembered telling the police and people at the hospital that someone else did this to her, that after the rape the defendant did not live with them anymore, that she had to leave her mother and brother and go live with another family for a while and this was upsetting to her, and that she first told her mother that the defendant was the one that raped her right before she had the interview with Amalee Gordon. She could not remember certain other details, such as talking to one of the defense attorneys a year-and-a-half after the rape, talking to certain police officers after the rape, or making the first videotaped statement.
After the State rested its case, the defense presented evidence attempting to show that Oatis was the likely rapist, pointing out that he lied about being in school that day and that the defendant had identified his bike as the one the suspect used.[17] To counter the state's witnesses' characterization of the bike as inoperable, the defense presented the testimony of Kimberly Parnell, a nearby resident who was interviewed by police when they canvassed the neighborhood. She testified that she often saw several young men, including Oatis, in the neighborhood riding this same bike, some of whom used it to sell drugs, and that she saw Oatis refill the tires with air before riding it because of its poor condition. Ronnie Montgomery, a private investigator hired by the defense, testified that he was unable to locate Oatis.
A cornerstone of the defendant's case was that the victim was coerced into changing her story, and that a comparison of the first and second videotapes showed that the first tape was much more detailed than the second, suggesting that the first was more truthful. The defense also presented evidence attempting to show that the victim's mother, C.H., changed her story in order to be reunited with her daughter. Catherine Holmes, a family friend, testified that C.H. expressed great fear that she would lose custody of her daughter. According to Holmes, C.H. described visiting her daughter after she was removed from her home and telling the victim that it was okay to tell people that defendant raped her because C.H. was instructed to do so by "them." After the victim was returned to C.H., Holmes said C.H. cut off all contact with her. Robert *772 Tucker, a private investigator hired by the defense, testified that he interviewed the victim in 1999 and that she told him that she was raped by a young man who fled on a bicycle and that defendant did not rape her. Tucker said that C.H. told him that she was afraid, based on harassment and threats from police and social workers, that she would lose custody of her daughter. The defense also stressed the lack of any physical evidence directly linking the defendant to the crime.
After hearing all this evidence, the jury returned a guilty verdict of aggravated rape, which necessitated a capital sentencing phase. The State presented the testimony of S.L. The defendant was married to S.L.'s cousin and godmother, C.S., and S.L. spent the summer with defendant and C.S. when she was about eight or nine years old. S.L. testified that defendant sexually abused her three times, the first involved inappropriate touching, the last was intercourse. She did not tell anyone until two years later and the family pressured her not to pursue legal action so she did not. The defense presented seven witnesses who testified as to the effect defendant's execution would have on his family and friends. At the conclusion of the penalty phase, the jury unanimously determined that defendant should be sentenced to death. The defendant filed a motion for a new trial as to the guilt and penalty phase verdicts, a motion for judgment notwithstanding the verdict, and a motion in arrest of judgment, all arguing that the statute under which defendant was prosecuted, La. R.S. 14:42, is unconstitutional. After denying these motions, the court sentenced defendant to death in accordance with the jury's verdict. Defendant now appeals to this Court, assigning 69 errors. We will address the most significant of these errors in this opinion, and the remaining errors will be addressed in an unpublished appendix to this opinion.
Before addressing the overriding legal issue presented by this appeal, which is whether the statute under which defendant was prosecuted is constitutional in that it authorizes the death penalty for a non-homicide crime, we must first address whether the defendant's conviction must fall for any other reason assigned by the defendant.
I. Right of Confrontation and the Videotaped Victim Interviews
On appeal, the defendant raises several assignments of error related to his right of confrontation arising from the admission of the victim's videotaped interview conducted by Amalee Gordon, in which the victim accuses the defendant. First, the defendant argues that the statute which authorized the use of the videotape, La. R.S. 15:440, et seq., is unconstitutional. Further, the defendant argues that the admission of the videotape constituted a statutory violation of La. R.S. 15:440, et seq., because the victim was unavailable for cross-examination.
The Confrontation Clause of the Sixth Amendment safeguards the defendant's rights to confront his accusers and to subject their testimony to rigorous testing in an adversary proceeding before the trier of fact. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Although face-to-face confrontation forms the core of the Clause's values, it is not an absolute right of the defendant. Id.; Ohio v. Roberts, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). Through exceptions to the hearsay doctrine, testimony may be introduced against the defendant without a physical, face-to-face confrontation at trial under certain circumstances, provided the denial of such confrontation is necessary to further an important public policy interest and further provided that *773 the testimony's reliability is otherwise assured. Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).
One recognized important public policy interest is the protection of abused children. Id.; Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Louisiana is one of many states which have developed special procedures to protect child witnesses testifying about abuse from unnecessary additional trauma, allowing videotaped statements of abused children to be admitted in court, provided certain conditions are met, La. R.S. 15:440 et seq., and allowing abused children to testify out of court via closed circuit television systems, La. C. Cr.P. art. 283. However, Louisiana's provisions creating special arrangements for abused children contain strict requirements designed to ensure that these accommodations do not compromise the rights of defendants to confront adverse witnesses and test the reliability of their testimony.
The legislature first authorized the videotaping of victim statements in cases of child abuse in which the victim was under the age of 14 years at the time of the offense. 1984 La. Acts 563; La. R.S. 15:440.1-440.6. The purpose of the legislation was to facilitate prosecution of offenders who have committed crimes of violence against children "with a minimum of additional intrusion into the lives of such children." The statute authorizes videotaping the statements of such victims and introducing the statements at trial "as an exception to the hearsay rule." La. R.S. 15:440.3. It sets out conditions for taking the statement in the absence of the child's parents or relatives and with a minimum of questioning "calculated to lead the child to make any particular statement." La. R.S. 15:440.4.[18]
In order to be admissible, the videotape must meet the requirements of La. R.S. 15:440.5, which provides as follows:
440.5. Admissibility of videotaped statements; discovery by defendant
A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
(1) No attorney for either party was present when the statement was made;
(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;

*774 (4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
(5) Every voice on the recording is identified;
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;
(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and
(8) The protected person is available to testify.
B. The admission into evidence of the videotape of a protected person as authorized herein shall not preclude the prosecution from calling the protected person as a witness or from taking the protected person's testimony outside of the courtroom as authorized in R.S. 15:283. Nothing in this Section shall be construed to prohibit the defendant's right of confrontation.
C. In a criminal prosecution, when the state intends to offer as evidence a copy of a videotaped oral statement of a protected person made pursuant to the provisions of this Subpart, the defendant may be provided a copy of the videotape if the court determines it necessary to prepare a proper defense. If the court orders the defendant be provided a copy of the videotaped statement, only the attorney and the defendant shall be permitted to view the tape and no copies shall be made by any person. The copy shall be returned to the court immediately upon conclusion of the case. Any violation of this Subsection shall be punished as contempt of court.
At trial, after the victim took the stand, the State offered the videotape into evidence and defense counsel stipulated that the videotape was in compliance with the requirements of La. R.S. 15:440.5. In addition, defense counsel expressly stated that it had "no objection" to the admissibility of the tape. Furthermore, as early as the opening statement, the defense calculated the December 16, 1999, videotape would be played for the jury, as it instructed the jury to watch both this videotape and the March, 1998, videotape closely because the March, 1998, videotape would provide more detail and thus be more truthful. However, now, the defendant characterizes the impact of the admission of this tape as devastating to his case.
The defendant concedes that these issues were not presented to the court below, as defense counsel expressly stipulated to the admission of the tape and stated he had "no objection to the tape." However, he contends that La. R.S. 15:440.5 is unconstitutional on its face, which can be addressed by this Court in the absence of contemporaneous objection in the court below. He argues that under existing jurisprudence this Court may consider its validity despite the failure of the defense to move to quash the statutory provisions or otherwise object on confrontation grounds to the admission of the videotaped statement.[19]See State v. *775 Green, 493 So.2d 588, 590 (La.1986) (The facial unconstitutionality of a statute on which a conviction is based is an error discoverable by the mere inspection of pleadings and proceedings, without inspection of the evidence, which an appellate court is entitled to review, even though the defendant did not comply with the assignment of error procedure.) However, this Court has applied this rule only in the context of challenges to the facial validity of substantive criminal statutes. In this case, the statutes at issue concern only the nature of the evidence admitted at trial. As with any other ruling by a trial court admitting or excluding evidence, defendant must object to the ruling to preserve the issue for review. La.C.Cr.P. art. 841 ("[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); State v. Thomas, 427 So.2d 428, 433 (La. 1982) (on rehearing) (the contemporaneous objection rule prevents "a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection."). In the present case, defense counsel not only failed to object to the admission of the videotape but he also stipulated to its admissibility.
However, assuming the facial unconstitutionality of this statute can properly be considered in the absence of an objection at trial, we reject defendant's argument that this statute is unconstitutional on its face.[20] The defendant argues that Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), makes clear that the admission of "testimonial" statements, such as the victim's in this case, violates the Sixth Amendment.
Traditionally, for purposes of the Confrontation Clause, all hearsay statements were admissible if: (1) the declarant was unavailable to testify; and (2) the statement fell under a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). However, in Crawford, the United States Supreme Court overruled Roberts insofar as it applies to out-of-court statements that are "testimonial" in nature. The Court held that the adequate "indicia of reliability" standard *776 set forth in Roberts is too amorphous to adequately prevent admission of "core testimonial statements that the Confrontation Clause plainly meant to exclude." Crawford, 541 U.S. at 63, 124 S.Ct. at 1371.
The Crawford Court drew a distinction between testimonial and non-testimonial hearsay and noted that non-testimonial hearsay is admissible when both prongs of Roberts are satisfied, regardless of whether the defendant has had a prior opportunity to cross-examine the declarant. Crawford, 541 U.S. at 63, 124 S.Ct. at 1371. On the other hand, the Court held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Id. The Court also declined to provide a comprehensive definition of "testimonial," observing that, "whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id., 541 U.S. at 68. "These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id.[21]
While Crawford did establish as an important requirement for Sixth Amendment purposes that the defendant have a prior opportunity to cross-examine the declarant, and that requirement was clearly not *777 met in this case, Crawford also expressly stated:
Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See California v. Green, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements "cannot be replicated, even if the declarant testifies to the same matters in court." Post, [124 S.Ct.] at 1377 (quoting United States v. Inadi, 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (Emphasis added.)
541 U.S. 59, n. 9, 124 S.Ct. 1354. Therefore, according to Crawford, a testimonial videotaped statement is not inadmissible under the Sixth Amendment if "the declarant is present at trial to defend or explain it." Id.
Thus, it is clear that La. R.S. 15:440.5 is not facially unconstitutional as it specifically requires as a condition of admissibility that "the protected person is available to testify." La. R.S. 15:440.5(8). Whether the victim was actually "available to testify" or "present at trial to defend or explain" her statement is thus the only remaining issue related to the admissibility of the videotape. This raises the related questions of whether the statute is constitutional as applied in this case, and/or whether the admission of the tape was a statutory violation of La. R.S. 15:440.5(8), because, as urged by the defendant, although she took the stand at trial, her lack of memory rendered her "unavailable."
Once again, we note that the defendant stipulated to the admissibility of the tape before it was played and expressly stated that he had "no objection to the tape." Even after the cross-examination, he still did not object on the grounds that the victim's alleged lack of memory rendered her unavailable. Thus, this objection is clearly waived. La.C.Cr.P. 841. However, in an abundance of caution, we find that even had defendant objected, we would still find that the victim was "available to testify" for purposes of La. R.S. 15:440.5(8) and the Confrontation Clause.
The defendant argues that although the victim was physically present to testify, she was unable to respond to questioning in a meaningful way and simply adopted her videotaped statement, which was obtained without the presence of defense counsel or any opportunity to effectively cross-examine the witness either pre-trial or at trial. Defendant contends that the victim's poor memory rendered her unavailable for cross-examination despite her physical presence on the stand.
We disagree. A witness may be physically present in a courtroom and still be "unavailable." See, e.g., State v. Nall, 439 So.2d 420 (La.1983); State v. Pearson, 336 So.2d 833 (La.1976); State v. Ghoram, 328 So.2d 91 (La.1976). However, since the Supreme Court's decision in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court has made clear that "[t]he Confrontation Clause guarantees only `an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" United States v. Owens, 484 U.S. 554, 561, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985)) (emphasis in original). In Owens, the trial court allowed the admission of the testimony of a *778 witness with amnesia that although he remembered identifying defendant as his attacker, he no longer had an independent memory of the attack. Id. at 840-41. The Supreme Court found that this was not in violation of defendant's Confrontation Clause rights because, even though amnesia rendered effective cross-examination difficult, it did not deprive defendant of "an opportunity for effective cross examination." Id. at 842.
In this case, the victim was able to answer the vast majority of the questions asked of her. See, supra pp. 767-71. In court, she identified defendant as the person who raped her, and testified that she remembered making the videotape, that everything happened as she reported on the videotape, that she earlier had told police and others that a boy had raped her but that was a lie, and she testified about circumstances surrounding the rape. The fact that she could not remember meeting with specific people during the investigation and that she did not remember making the first videotape with Dr. McDermott does not render her "unavailable" for purposes of the statute or the constitution. She was clearly able to "defend or explain" the videotaped statement at trial. These assignments of error lack merit.
The defendant next claims that the admission of C.H.'s testimony that L.H. told her the defendant raped her violates the hearsay rule. As stated above, C.H. followed the victim to the stand and told jurors that after her daughter returned to her custody in 1998, L.H. came to her one night and confided that "she couldn't hold it [in] anymore that Patrick Kennedy had raped her." The state offered C.H.'s testimony over defense hearsay objections as "the first reporting to her mother," for purposes of La.C.E. art. 801(D)(1)(d) (defining as non-hearsay the prior consistent statement of a declarant who testifies in court subject to cross-examination referring to an "initial complaint of sexually assaultive behavior.") The statutory provision reflects a longstanding jurisprudential rule exempting the initial report of a child rape victim from the hearsay rule. See, e.g., State v. Prestridge, 399 So.2d 564, 572 (La.1981)("[I]n the prosecution of sex offenses the better rule is that the original complaint of a young child is admissible when the particular facts and circumstances of the case indicate that the complaint was the product of a shocking episode and not a fabrication."); State v. Adams, 394 So.2d 1204, 1212 (La.1981) (same); State v. Noble, 342 So.2d 170, 173 (La.1977) (same).
We find this statement clearly was not made under emergency circumstances shortly after the offense, and the press of the shocking episode most likely dissipated over the course of nearly two years to a point where it no longer assured the reliability of the assertion even for purposes of Louisiana's hearsay rules. Moreover, the statement constituted L.H.'s initial report of the sexual assault only from the state's perspective. It remained for jurors to determine whether her first report to the police, that two black boys had been involved, or to her mother, told the truth of the matter.
However, even assuming that the trial erred in admitting C.H.'s testimony, the ruling was clearly harmless. This Court has long held that the admission of hearsay testimony is harmless error when the effect is merely cumulative or corroborative of other testimony adduced at trial. State v. Johnson, 389 So.2d 1302 (La.1980); State v. McIntyre, 381 So.2d 408, 411 (La. 1980). As this evidence was merely cumulative of the evidence provided in the videotaped statement of L.H. previously viewed by the jury, and L.H.'s testimony *779 at trial, the admission of this evidence constitutes harmless error.
Finding no other errors in defendant's conviction and sentence, we now reach the seminal issue in this case.[22]
II. Capital Punishment for Non-Homicide Aggravated Rape
Looming over this case is the potential for the defendant to be the first person executed for committing an aggravated rape in which the victim survived since La. R.S. 14:42 was amended in 1995 to allow capital punishment for the rape of a person under the age of twelve. The defendant contends that Louisiana stands in a minority of jurisdictions in which legislatures have authorized capital punishment for the rape of a child not resulting in homicide[23] and predicts that La. R.S. 14:42 is unlikely to survive the scrutiny of the United States Supreme Court, whose decisions the defendant interprets as making it clear that the loss of life is the essential component which renders capital punishment a proportionate penalty under the Eighth Amendment.[24]
The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In Weems v. United States, the United States Supreme Court first discussed the Eighth Amendment as being "progressive, and . . . not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice." 217 U.S. 349, 366-67, 378, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Decades later, in Trop v. Dulles, the Supreme Court established that "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630. (1958). This Eighth Amendment framework was further defined in Gregg v. Georgia, which held that a punishment is excessive and *780 unconstitutional under the Eighth Amendment if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more that the purposeful and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (affirming the death sentence for first-degree murder). In Coker v. Georgia, discussed infra, the Court further explained:
A punishment might fail the test on either ground. Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent. To this end, attention must be given to the public attitudes concerning a particular sentence history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions are to be consulted.
433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).[25]
Before 1977, aggravated rape was punishable by death in Louisiana. In 1976, the United States Supreme Court invalidated the death-penalty provision of Louisiana's aggravated-rape statute based on the notion that the imposition and carrying out of the death penalty for that crime constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Selman v. Louisiana, 428 U.S. 906, 96 S.Ct. 32l4, 49 L.Ed.2d 1212 (l976). In 1977, the Court held that capital punishment for the rape of an adult woman violated the Eighth Amendment. Coker, supra.
The Louisiana Legislature again capitalized the crime of aggravated rape in 1995, but restricted it to the aggravated rape of a child under the age of 12 years, and provided for the punishment of "death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury." La. Acts 1995, No. 397, ง 1, La. Acts 1997, No. 898 and 757; La. R.S. 14:42(D)(2).[26]
*781 In State v. Wilson, 96-1392 (La.12/13/96), 685 So.2d 1063, cert. denied, Bethley v. Louisiana, 520 U.S. 1259, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997), in the context of pre-trial appeals by the state from the granting of motions to quash, this Court upheld the constitutional validity of the death penalty for the crime of aggravated rape when the victim is under 12 years of age.[27] In so doing, we distinguished the rape of a child from the United States Supreme Court's decision in Coker, supra. For while Coker clearly bars the use of the death penalty as punishment for the rape of an adult woman, it left open the question of which, if any, non-homicide crimes can be constitutionally punished by death. Because "children are a class that need special protection," we concluded that "given the appalling nature of the crime, the severity of the harm inflicted upon the victim, and the harm imposed on society, the death penalty is not an excessive penalty for the crime of rape when the victim is a child under the age of twelve years old." Wilson, supra at 1070. In distinguishing the Wilson case from Coker, we pointed out that the plurality in Coker "took great pains in referring only to the rape of adult women throughout their opinion," as being disproportionate to the death penalty, referring to an "adult woman" fourteen times. Id. at 1066.[28]
Wilson freely acknowledged at the outset that Louisiana stood alone at that time in providing the death penalty for child rape in which the victim does not die because other jurisdictions sharing similar views, i.e., Tennessee, Florida, and Mississippi, had already struck down their laws for a variety of reasons. Wilson, 685 So.2d at 1068. Nevertheless, on the premise that "[t]here is no constitutional infirmity in a state's statute simply *782 because that jurisdiction [chooses] to be first," and taking into account that "[s]tatutes applied in one state can be carefully watched by other states so that the experience of the first state become available to all other states," the Court thereby left room for the possibility "that other states are awaiting the outcome of the challenges to the constitutionality of the subject statute before enacting their own." Wilson, 685 So.2 at 1069.
In the present case, however, unlike in Wilson, the issue is no longer hypothetical. For the first time since the enactment of Louisiana's present bifurcated capital sentencing scheme, the Court has before it a defendant condemned to death for a crime in which the victim did not die. The defendant predicts that Louisiana's aggravated rape statute will not survive federal scrutiny on the basis of a series of decisions, including Coker, in which death sentences for non-homicide offenses were set aside. See Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (holding that the death penalty is an excessive penalty for a robber who does not take a human life); Eberheart v. Georgia, 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977) (holding that aggravated kidnaping did not warrant a death sentence); U.S. v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (holding the death-penalty clause of the Federal Kidnapping Act unconstitutional).
In considering defendant's argument, we must address the question in the context of the Eighth Amendment analysis recently refined by the United States Supreme Court in the watershed decisions of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)(exempting mentally retarded persons from capital punishment) and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed. 1 (2005) (exempting from capital punishment all defendants under the age of 18 years at the time of commission of a capital crime). Atkins and Roper reaffirm the Court's view that at its core the Eighth Amendment requires the Court to refer to "the evolving standards of decency that mark the progress of a maturing society to determine which punishments are so disproportionate as to be cruel and unusual." Roper, 543 U.S. at 561, 125 S.Ct. at 1190 (internal quotation marks and citation omitted). In making that determination, Atkins and Roper also reaffirmed the Court's view prior to Stanford v. Kentucky, supra, that "the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." Roper, 543 U.S. at 563, 125 S.Ct at 1191-92 (quoting Atkins, 536 U.S. at 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (quoting Coker, 433 U.S. at 597, 97 S.Ct. at 2868)). Thus, a bare majority of the prior Court subscribed to a two-part analysis under the Eighth Amendment:
The beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. This data gives us essential instruction. We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment . . .
Roper, 543 U.S. at 564, 125 S.Ct. at 1192. Both Atkins and Roper also looked to the frequency of the use of capital punishment where it is permissible as an objective indicia of consensus. This test has never been reconsidered or applied by the current Court and its new members.[29]
*783 The first part of this test takes into account more than simply a numerical counting of which states among the 38 jurisdictions permitting capital punishment stand for or against a particular capital prosecution. The Court will also take into account the direction of change. In Atkins, the Court thus noted with respect to the number of states that had abandoned capital punishment for the mentally retarded following the Court's decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(Eighth Amendment does not bar execution of the mentally retarded)(overruled by Atkins), "it is not so much the number of these States that is significant, but the consistency of the direction of change." Atkins, 536 U.S. at 315, 122 S.Ct. 2242. The Court thus attached particular significance to the number of states which adopted statutes precluding execution of the mentally retarded together with the failure of any state legislature to adopt the death penalty for the mentally retarded following the decision in Penry. Atkins, 536 U.S. at 315-16, 122 S.Ct. at 2249 ("Given the well-known fact that anti-crime legislation is far more popular than legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal."). In Roper, the Court reinforced the importance of the direction of change to its analysis, finding the fact that five states (four through legislative enactment and one through judicial decision), that had allowed the death penalty for juveniles prior to Stanford now prohibited it, constituted a significant trend toward the abolition of the juvenile death penalty. The Roper Court then concluded that, "[a]s in Atkins, the objective indicia of consensus in this caseโthe rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice โprovide sufficient evidence that today our society views juveniles, in the words of Atkins used respecting the mentally retarded, as `categorically less culpable than the average criminal.'" Roper, 543 U.S. at 567, 125 S.Ct. at 1194.
The second part of the test, in which the Court will bring its own independent judgment to bear on the Eighth Amendment question, proceeds from the premise that "[c]apital punishment must be limited to those offenders who commit `a narrow category of the most serious crimes' and whose extreme culpability makes them `the most deserving of execution.'" Roper, 543 U.S. at 568, 125 S.Ct. at 1194 (quoting Atkins, 536 U.S. at 319, 122 S.Ct. at 2251). The Court will thus consider whether capital punishment for a particular class of offenders serves the twin social purposes of deterrence and retribution.[30] Although *784 intentional murders unquestionably fall into the category of the most serious crimes, Atkins and Roper concluded that neither the mentally retarded nor juvenile offenders under the age of 18 years when they commit the crime can "with reliability be classified among the worst offenders." Roper, 543 U.S. at 569, 125 S.Ct. at 1195.[31] While the Court has exercised its independent judgment in Coker to determine that the rapist of an adult woman is not an offender who commits "`a narrow category of the most serious crimes' and whose culpability makes them `the most deserving of execution,'" Roper supra, 543 U.S. at 568, 125 S.Ct. 1183, it has not yet analyzed whether the rape of a child under twelve falls in that category.
Thus, we must undertake the first part of the Supreme Court's Eighth Amendment test, analyzing the legislative enactments of other states that have addressed the issue. Since Wilson, four more states, Oklahoma, South Carolina, Montana, and Georgia, presently prescribe capital punishment for child rape. Two of the jurisdictions, Oklahoma and South Carolina, recently adopted their laws in 2006. Montana enacted a child rape capital punishment statute in 1997. These state statutes are more narrowly drawn than Louisiana, as all three require proof that the defendant previously had been convicted of sexual assault of a child before he becomes death eligible. See 10 Okl. St. Ann. ง 7115(I)(2006 Supp); Mont.Code Ann. ง 45-5-303; S.C.Code Ann. ง 16-3-655(C)(I)(2006 Supp). Georgia has persistently reenacted its capital rape provisions, Ga.Code Ann. ง 16-6-1(a)(1), although *785 some 40 years have passed since the decision in Coker. The courts of that state readily acknowledge that while the offense remains classified as a capital crime for procedural purposes, the death penalty is not available when the victim is an adult woman. Merrow v. State, 268 Ga.App. 47, 601 S.E.2d 428 (2004).[32] However, in 1999, the Georgia legislature added subsection (1)(a)(2), which proscribes the carnal knowledge of a female less than 10 years old as a capital offense. See State v. Lyons, 256 Ga.App. 377, 568 S.E.2d 533, 535 (Ga.Ct.App.2002). This statutory provision thus places Georgia in the ranks of those jurisdictions which provide capital punishment for the rape of a child which does not necessarily result in the death of the victim. Florida has retained capital child rape as a matter of statutory law but has not enforced it since 1981 following the decision in Buford v. State, 403 So.2d 943 (Fla.1981) which struck down the law in light of Coker. Thus, a stark analysis shows that of the 38 states allowing the death penalty, only 5 provide it for child rape.
However, the proportionality analysis question under the Eighth Amendment and the situation in the rest of the country is more complex. For in our view, and evidently the view of the United States Supreme Court,[33] child rape is the most heinous of all non-homicide crimes, and while the majority of other states may not provide capital punishment for child rape, many do provide capital punishment for other non-homicide crimes which are far less heinous. Thus, this analysis should look beyond the child rape penalty provisions of other states and instead should consider all non-homicide capital statutes to determine the national consensus for capital punishment in non-homicide cases.
Commentators taking opposite views in the debate spectrum over the question of death for child rape have difficulty in agreeing which states among the 38 jurisdictions permitting capital punishment do or do not provide the death penalty for crimes which do not result in the death of the victim. See Melissa Meister, Murdering Innocence: The Constitutionality of Capital Child Rape States, 45 Ariz. L.Rev. 198 (2003)(advocating capital child rape statutes); Joanna H. D'Avella, Note, Death Row for Child Rape? Cruel and Unusual Punishment Under the Roper-Atkins "Evolving Standards of Decency" Framework, 92 Cornell L.Rev. 129 (2006)(discussing Patrick Kennedy's case specifically and advocating the defense point of view); Ashley M. Kearns, South Carolina's Evolving Standards of Decency: Capital Child Rape Statute Provides a Reminder That Societal Progression Continues Through Action, Not Idleness, 58 S.C. L.Rev. 509 (2007).[34] However, most *786 agree that the number of jurisdictions allowing the death penalty for non-homicide crimes at least doubled between 1993 and 1997. Kearns, 58 S.C. L.Rev. at 520, 521, and n. 110 (citing Meister, supra note 108, at 210-212 and Michael Mello, Executing Rapists: A Reluctant Essay on the Ethics of Legal Scholarship, 4 Wm. & Mary J. Women & L., 129, 160-61 (1997) (noting that in 1993, at least six states authorized death for non-homicide crimes, and by 1997, that number had grown to fourteen)).
Our own survey, which also includes the 2003 Bureau of Justice Statistics report on capital punishment,[35] indicates that 24 of the 38 states permitting capital punishment provide the death penalty only for crimes resulting in the death of the victim. Of the remaining 14 states, 5 provide capital punishment for child rape, as discussed above. Five more provide the death penalty for sui generis extraordinary crimes against the government, i.e., treason, espionage, aircraft piracy. See Ark.Code Ann. ง 5-51-201 (Michie 1997); Cal.Penal Code ง 37 (West 1999); Miss.Code Ann. งง 97-7-67, 97-25-55 (West 2003); N.M. Stat. Ann. ง 20-12-42 (Michie 1989); Wash. Rev.Code Ann. ง 9.82.010 (West 2006 Supp.).[36] Four states provide capital punishment for aggravated kidnapping offenses similar to Louisiana's (non-capital) crime of aggravated kidnapping in R.S. 14:42. See Colo.Rev.Stat. Ann. ง 18-3-301; Idaho Code, งง 18-4502, 18-4504 (Michie 2000); Mont.Code Ann. 45-5-503 (West 2005); S.D. Codified Laws ง 22-19-1 (Michie 1998). While it remains unclear why the legislatures in those states have felt free to prescribe capital punishment for a crime decapitalized by the Supreme Court in Eberheart v. Georgia, 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977)(Per Curiam citing Coker) when it does not result in the death of the victim, Eberheart may be read narrowly as a companion case of Coker (which it cites explicitly), as the crime involved a particularly brutal but non-lethal gang rape of a woman abducted at roadside as she attempted to fix a flat tire, see Eberheart v. State, 232 *787 Ga. 247, 206 S.E.2d 12 (1974), and not as a broad statement that capital punishment may not be inflicted for a kidnapping which harms but does not kill the victim. In addition, three of the statutes are narrowly drawn and decapitalize the crime if the victim is released, before conviction of the offender (Colorado) or imposition of sentence (Idaho), or released unharmed at any time (Montana), to encourage the kidnapper to spare the victim's life. On the other hand, South Dakota imposes no such limits on its kidnapping law, thus making the crime more serious in that state than the rape of a child under the age of 10, a crime carrying a mandatory term of life imprisonment. S.D. Codified Laws งง 22-22-1; 22-6-1 (Michie 1998). Despite the constitutional uncertainty of the laws,[37] these jurisdictions count in the survey of states which permit capital punishment for non-homicide crimes.
Utah had made aggravated assault by a prisoner as a capital crime until the Utah Supreme Court struck the statute down in State v. Gardner, 947 P.2d 630, 653 (Utah 1997)("We may or may not think the Supreme Court reached the right result in [Coker], but we do not see the persuasiveness of an argument that any aggravated assault, no matter how vicious, could be legally more reprehensible than any rape, no matter how brutal. And under Coker, no rape, `with or without aggravating circumstances,' can constitutionally qualify for the death penalty when death has not resulted.")(emphasis added by the court). Accordingly, in terms of which jurisdictions presently allow for at least the possibility of capital punishment for non-homicide crimes (apart from whether it is actually imposed), Utah no longer ranks among those states. However, a similar law in Montana remains in effect. Mont.Code Ann. ง 46-18-220 (2005).
In spite of its decision in State v. Buford, supra, Florida remains among the ranks of non-homicide capital jurisdiction because of its sweeping drug laws which provide for capital punishment in extreme cases even when the offense does not result in the actual death of anyone. See, e.g. Fla. Stat. Ann. ง 893.135(3) (West 2007 Supp) (importation of 300 or more kilograms of cocaine into the state when the offender "knows that the probable result of such importation would be the death of any person"); see also Fla. Stat. Ann. ง 921.142(1)("The Legislature finds that trafficking in cocaine or opiates carries a grave risk of death or danger to the public; that a reckless disregard for human life is implicit in knowingly trafficking in cocaine or opiates; and that persons who traffic in cocaine or opiates may be determined by the trier of fact to have a culpable mental state of reckless indifference or disregard for human life."). In effect, Florida has imported into its non-homicide drug laws the culpable mental state found sufficient by the Supreme Court to support a sentence of death in homicide cases. See Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Thus, 14 of the 38 states permitting capital punishment provide the death penalty for non-homicide crimes: Louisiana, Oklahoma, South Carolina, Georgia, Arkansas, California, Mississippi, New Mexico, Washington, Colorado, Idaho, Montana, South Dakota, and Florida.
*788 At the federal level, of the 39 crimes carrying the death penalty, excluding the extraordinary crimes of treason and espionage, the overwhelming majority require the death of a person. However, 18 U.S.C. 3591(b)(1) and 21 U.S.C. 848(e) combine to provide capital punishment for the kingpin of an extraordinarily large continuing criminal drug enterprise.
Overall, it appears that approximately 38% of capital jurisdictions (15 of 39, including federal) authorize some form of non-homicide capital punishment, a showing strong enough to suggest that there may be no consensus one way or the other on whether death is an appropriate punishment for any crime which does not result in the death of the victim. However, when the direction of change is considered, clearly the direction is towards the imposition of capital punishment for non-homicide crimes. As stated earlier, the number of jurisdictions allowing the death penalty for non-homicide crimes more than doubled between 1993 and 1997.
Most important to our analysis is the fact that four states have enacted laws which capitalize child rape since Wilson, evidencing movement in the direction that this Court thought possible back in 1996 when Wilson was decided. Looked at another way, even after the Supreme Court decided in Coker that the death penalty for rape of an adult woman was unconstitutional, five states nevertheless have capitalized child rape since then, a number which the Supreme Court held in Roper was sufficient to indicate a new consensus regarding society's standards of decency towards the juvenile death penalty. In fact, the trend is more compelling than in Roper, given the Roper Court's reliance on five states abolishing the death penalty for juveniles after Stanford held that the death penalty for juveniles was constitutional. Here, we have five states enacting the death penalty for child rape in spite of Coker, which held that the death penalty for rape of an adult was unconstitutional. Furthermore, it is likely that the ambiguity over whether Coker applies to all rape or just adult rape has left other states unsure of whether the death penalty for child rape is constitutional. These states may just be taking a "wait and see" attitude until the Supreme Court rules on the precise issue. Thus, the fact that only five states capitalize child rape should not pose an obstacle to the Court's consideration of the issue, given the direction of change, i.e., an increase of five since Coker.
Because of the direction of change towards the death penalty for child rape and given the lack of consensus either way when considering the number of capital jurisdictions that authorize the death penalty for non-homicide crimes (38%), in our view, the second stage of the Atkins/Roper analysis becomes relevant.
Whether child rapists rank among the worst offenders is largely an a priori judgment of whether the Eighth Amendment requires a bright-line rule of death only for death. The Supreme Court has characterized rape as a crime second only to homicide in the harm that it causes. See Coker, supra, 433 U.S. at 597, 97 S.Ct. 2861 ("Short of homicide, [rape] is the `ultimate violation of self.'")(quoting U.S. Dept. of Just., Law Enforcement Assistance Administration Report, Rape and Its Victims: A Report for Citizens Health Facilities and Criminal Justice Agencies (1975)). Given that characterization by the Court, it seems clear that if the Court is going to exercise its independent judgment to validate the death penalty for any non-homicide crime, it is going to be child rape.
While we cannot purport to exercise the Supreme Court's independent judgment on any matter, it can be said for *789 child rapists as a class of offenders that, unlike the young or mentally retarded, they share no common characteristic tending to mitigate the moral culpability of their crimes. Contrary to the mentally retarded and juvenile offenders, execution of child rapists will serve the goals of deterrence and retribution just as well as execution of first-degree murderers would.[38] Our state legislature, and this Court, have determined this category of aggravated rapist to be among those deserving of the death penalty, and, short of first-degree murder, we can think of no other non-homicide crime more deserving. As we previously held in Wilson:
Rape of a child under the age of twelve years of age is like no other crime. Since children cannot protect themselves, the State is given the responsibility to protect them. Children are a class of people that need special protection; they are particularly vulnerable since they are not mature enough nor capable of defending themselves. A "maturing society," through its legislature has recognized the degradation and devastation of child rape, and the permeation of harm resulting to victims of rape in this age category. The damage a child suffers as a result of rape is devastating to the child as well as to the community.[39]
Wilson, supra at 1067. We affirm that reasoning today and hold that the death penalty for the rape of a child under twelve is not disproportionate. Thus, we reject these assignments of error.
Defendant also argues that assuming that capital punishment is constitutional *790 for child rape under the Eighth Amendment as discussed above, Louisiana's procedure for determining when child rape should result in a death sentence is unconstitutional because it does not ensure that it will not be imposed arbitrarily or capriciously.
La. R.S. 14:42, as it read at the time of trial, defined aggravated rape as "a rape committed upon a person, sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of twelve . . ."[40] When the victim is under the age of twelve, La. R.S. 14:42(D)(2) authorizes the death penalty.[41] All other cases of aggravated rape are punishable by "life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. R.S. 14:42(D)(1).
La.C.Cr.P. art. 905.3 provides:
A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed. The court shall instruct the jury concerning all of the statutory mitigating circumstances. The court shall also instruct the jury concerning the statutory aggravating circumstances but may decline to instruct the jury on any aggravating circumstance not supported by evidence. The court may provide the jury with a list of the mitigating and aggravating circumstances upon which the jury was instructed.
Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating factors against aggravating factors, one against the other, according to any particular standard. State v. Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217, 1227-28; State ex rel. Busby. v. Butler, 538 So.2d 164, 173-74 (La.1988); State v. Jones, 474 So.2d 919, 932 (La. 1985). The distinctive feature of Louisiana's capital sentencing law is that "[t]he jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court . . . but it must find a statutory aggravating circumstance before recommending a sentence of death." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (also describing and upholding Georgia's sentencing provisions). The jury must consider and find one aggravating factor listed in La.C.Cr.P. art. 905.4 and must consider the mitigating factors listed in La.C.Cr.P. art. 905.5. Included as aggravating factors are that "the offender was engaged in the perpetration or attempted perpetration of aggravated rape," and the "the victim was under the age of twelve years . . ." La.C.Cr.P. art. 905.4(A)(1) and (10).
*791 Defendant argues that Louisiana's capital sentencing procedures fail to genuinely narrow the class of child-rapists eligible for the death penalty because 905.4 was designed solely to guide the jury's discretion in deciding which offenders guilty of first-degree murder are eligible for the death penalty and provides no basis by which juries can determine which child rapists deserve the death penalty and which do not.
However, as we previously held in Wilson, the United States Supreme Court held in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988),[42] a death sentence does not violate the Eighth Amendment merely because the single statutory "aggravating circumstance" found by the jury duplicates an element of the underlying offense. To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty" of the same crime. 484 U.S. at 24, 108 S.Ct. 5464 (citing Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)). Lowenfield held:
the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.
Id., 484 U.S. at 246, 108 S.Ct. 546. Accordingly, the Court held that "the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." Id.
Thus, under Lowenfield, the narrowing function may either be done in the underlying statute itself, in this case La. R.S. 14:42, or in the sentencing statute, La. C.Cr.P. art. 905.4, and the fact that the aggravating circumstance, i.e., victim under the age of 12, duplicates and element of the crime, victim under the age of 12, does not invalidate the statute. As found by Lowenfield in the context of murderers, "the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more." Id., 484 U.S. at 246, 108 S.Ct. 546.
The reasoning of Lowenfield plainly applies to Louisiana's sentencing scheme for capital rape.[43] This assignment of error lacks merit.[44]
*792 III. Capital Sentence Review
Under La.C.Cr.P. art. 905.9 and Supreme Court Rule XXVIII, this Court reviews each death sentence imposed by the courts of this state to determine if it is constitutionally excessive. In making its determination, the Court considers whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's finding with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge submitted a Uniform Capital Sentence Report and Capital Sentence Investigation Report as Supreme Court Rule XXVIII requires. Those documents reveal that the defendant is a black male who was 34 years of age when he committed the instant aggravated rape in March of 1998 and is currently 43 years old. The defendant has two dependent stepchildren, a stepdaughter age 14 (the victim of the instant offense) and a stepson age 10. The Sentence Report reflects that his father predeceased him in 2000 and his mother is still living. The Sentence Report indicates that the highest grade completed was eighth grade. This report also lists the defendant as being the half-brother to a son born of his mother, half-brother to two sons from his father, and half-brother to a sister from his father. The Sentence Report reveals that no psychiatric evaluation was made to determine sanity but that the defendant was interviewed by psychologists to determine if he is mentally retarded, and the district court determined that he was not. See discussion in the appendix to this opinion. There was testimony in a pre-trial hearing that the defendant completed his GED.
Portions of the Capital Sentence Report and the Investigation Report reveal the defendant had five prior convictions for issuing worthless checks between 1987-1992. The instant capital offense involves the March 2, 1998, aggravated rape of his step-daughter who was under the age of 12 years old at the time (age 8). There was testimony presented during the penalty phase that Kennedy also raped a child, now an adult, in 1984, but that he was never charged or convicted of this offense.
Passion, Prejudice and Other Arbitrary Factors. In capital cases the Court has heightened responsibility to determine whether argument introduced passion, prejudice, or other arbitrary factors which contributed to the jury's sentencing decision. The discussion of the various alleged instances of prejudicial prosecutorial comments, gruesome photographs and expert testimony regarding the extent of the injuries, and the victim's emotional display on the stand set forth instances which the defendant claims interjected of passion, prejudice, and other arbitrary factors into these proceedings. These claims are discussed and rejected in the appendix. For the reasons set forth in the discussion *793 of each of these assignments of error, we find that there is nothing to establish passion, prejudice, and/or other arbitrary factors were interjected into these proceedings in such a way that they contributed to the jury's decision that the defendant should suffer the death penalty
Aggravating Circumstance. As discussed above, the state introduced sufficient evidence to prove the presence of the aggravating circumstance of aggravated rape of a victim under the age of twelve years old. That this aggravating circumstance is the same as an element of the charged offense is discussed above, and does not merit reversal of the defendant's conviction and sentence.
Proportionality. This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offender and the offense. In this case, the state attempts to meet its obligations under Rule XXVIII by submission of a memorandum dealing with seventy-seven cases, purporting to catalog all first-degree murder cases in the 24th Judicial District Court in which sentence was imposed after January 1, 1976. The state also catalogs each capital rape case in which sentence was imposed after August 15, 1995, in the same judicial district. In five of the cases involving aggravated rape of a juvenile, the state opted not to seek capital punishment.[45] In two cases, prosecution was instituted as a capital case but defendants pled guilty and received life sentences. In two of the capital rape cases, the defendants were convicted but the jury did not unanimously vote to impose capital punishment during the penalty phase. Because this is the first time the death penalty has been imposed under Louisiana's revised aggravated rape law, there are no similar cases. However, the heinous nature of the crime and the severity of the injuries sustained by the victim distinguishes this case from aggravated rape cases in which the death penalty is either not requested or not imposed. In addition, we have held above that the death penalty in this case is not disproportionate under the Eighth Amendment.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In this event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.
CALOGERO, C.J., dissents and will assign reasons.
*794 CALOGERO, Chief Justice, dissenting and assigning reasons.
With the possible exception of sui generis crimes against the state involving espionage or treason, the Eighth Amendment precludes capital punishment for any offense that does not involve the death of the victim. Nearly thirty years ago, Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and its companion decision in Eberheart v. Georgia, 433 U.S. 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977), made that concept clear by striking down the death penalty for the crimes of rape and kidnapping in cases wherein the victims, although experiencing the "ultimate violation of self" short of death, and sustaining severe injuries, did not die. In the context of a rape of a sixteen-year-old juvenile, Coker, 433 U.S. at 605, 97 S.Ct. at 2872 (Burger, C.J. dissenting) ("After twice raping this 16-year-old victim, [Coker] stripped her, severely beat her with a club, and dragged her into a wooded area where he left her for dead."), the Supreme Court specifically observed that "the death penalty, which `is unique in its severity and irrevocability,' is an excessive penalty for the rapist who, as such, does not take human life." Coker, 433 U.S. at 598, 97 S.Ct. at 2869 (quoting Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976)). Although drawing support from an apparent widespread legislative rejection of the death penalty for rape in other state jurisdictions at the time, "in the end" the Supreme Court brought its "own judgment . . . to bear on the question of the acceptability of the death penalty under the Eighth Amendment," Coker, 433 U.S. at 597, 97 S.Ct. at 2868, just as, more recently, the Supreme Court brought its independent judgment to bear on the questions of whether the Eighth Amendment precludes capital punishment for mentally retarded offenders, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or for offenders under the age of eighteen years when they commit a capital crime. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).
Despite recent legislative enactments in other states, nothing approaching a consensus exists in capital jurisdictions on the appropriateness of the death penalty for non-homicide crimes. Coker retains its force undiminished today not only because the decision set out a bright-line and easily administered rule, but also because the "abiding conviction" expressed in that decision, id., 433 U.S. at 598, 97 S.Ct. at 2869, has served as the wellspring of the Supreme Court's capital jurisprudence over the past thirty years since Gregg. Capital punishment is unique in its severity and irrevocability and it is reserved by the Eighth Amendment for the worst of fully culpable offenders committing the worst crimes different in kind and degree from all others because they result in the taking of human life. See Roper, 543 U.S. at 568, 125 S.Ct. at 1194 ("Capital punishment must be limited to those offenders who commit `a narrow category of the most serious crimes' and whose extreme culpability makes them `the most deserving of execution.'") (quoting Atkins, 536 U.S. at 319, 122 S.Ct. at 2251).
I would adhere to that fundamental principle and therefore respectfully dissent.
NOTES
[*] Retired Judge Lemmie O. Hightower, assigned as Justice ad hoc, sitting for Associate Justice Jeannette T. Knoll, recused.
[1] In accordance with La. R.S. 46:1844(W)(1)(a), in order to protect the identity of the victim, her name, and her mother's name, will be referred to by the use of initials.
[2] This notice does not appear in the record. Defense counsel filed a bill of particulars on July 24, 1998, in which the defense requested to know whether the state would seek the death penalty. Presumably, this motion was satisfied promptly because defense counsel referred to "this capital case" in its August 26, 1998 motion for a Bernard hearing on the admissibility of victim impact evidence.
[3] In 99-KK-1850, this Court denied the defendant's application from the district court's refusal to strike aggravating circumstances from the indictment and to prohibit victim impact testimony during the penalty phase, noting that the defendant could re-raise these issues on appeal if convicted (Kimball, J., would grant). In 00-KK-1554, this Court granted the defendant's application to affirm the decision of the court of appeal, which reversed the district court's pre-trial ruling that an adult witness would be permitted to testify at trial under the "lustful disposition exception" that the defendant also raped her three times when she was a child, 16 years before the instant offense, but was never charged or convicted of the crimes (Victory, J., concurred, and Traylor, J., dissented). In a related application, which this Court denied in 00-KK-2428, the defendant sought review of the district court's refusal to schedule an additional pre-trial hearing in which defense counsel could more fully cross-examine this same adult witness. In 02-KK-2088, this Court denied the defendant's application from a determination by the court of appeal that the defendant failed to establish a prima facie case of gender discrimination in the selection of grand jury forepersons in Jefferson Parish (Johnson, J., would grant). In 03-KK-2269, this Court denied the defendant's application from the court of appeal's rejection of the defendant's contention that the legislature violated the ex post facto clause when it authorized the introduction of victim impact testimony during the penalty phase of trials (Calogero, C.J., concurring). In 03-KK-2393, this Court denied the defendant's application from the district court's denial of a defense motion for mistrial during the state's opening statement.
[4] However, as a result of pain, the victim had to be fed gallons of stool softener through a tube to permit her to begin defecating again.
[5] Arguello testified that he could not remember whether the defendant said his niece or his daughter has "just become a young lady."
[6] These phone calls made to Arguello and Madere were not known to police until several days after the rape, and later served to shift the focus of the investigation to the defendant.
[7] Sergeant Billy Lewis identified a tape and summary of the 911 call.
[8] Outside of the presence of the jury, Brown also stated that, in assessing the victim's blood loss, he noticed that the blood appeared to be more coagulated that it should have been if the time of the rape was reported accurately. This testimony was ruled inadmissible and not presented to the jury.
[9] Thirty officers canvassed the neighborhood looking for the suspects but to no avail.
[10] Outside of the presence of the jury, Sergeant Jones stated that Oatis had been expelled from John Ehret High School in November, did not inform his mother of the expulsion, and that his mother would drive him to school every day, after which he would walk back home, where he spent each day while she was at work. On March 2, Oatis's friend called his mother, pretending to be a school official, to inform her that he had been suspended for fighting and to instruct her to pick him up from school and take him home, which she did.
[11] The state and the defense stipulated that these videotaped interviews satisfied the requirements of La. R.S. 15:440.5. The interviews were videotaped on two successive days and submitted on two videotapes as defendant's exhibit 7 and 8, which were transferred to DVD and viewed in that format.

The first day is primarily devoted to collecting personal and familial history. On both days, the victim was questioned on her ability to distinguish truth from lies. On the second day, the victim was told that she must tell what happened to her. The victim initially refused and began to comply only after her favorite police officer, "Miss Rene", was brought into the room for support. This officer hugged the victim, and could be heard quietly asking the victim to trust her, and encouraging her to tell the truth about what happened. "Miss Rene" told her they want to know if her Dad did it and they want to make sure she is safe. The victim said "they want me to say my Dad did it and I don't want to say it. I'm going to tell the same story." She then said that nobody told her to change her story, but her Mom told her that may be why they want her to keep on telling her story.
The victim was extremely reluctant, stalled, spoke haltingly with long pauses, and ultimately told her version of the attack, while constantly asking to be reminded what she had said so far. She denied suffering nightmares or experiencing any fear that the rapist might return.
[12] On cross-examination, Lieutenant Gray Thurman testified that he spoke with Madere, who showed him a carpet-cleaning appointment made by defendant, which the B & B computer indicated was made on March 1 and scheduled for March 5. However, Thurman testified that Madere explained that the computer was in error and that the appointment was made on March 2 and rescheduled for March 5 after Theriot was unable to do the job on March 2.
[13] The parties stipulated that the victim was returned to her mother on June 22, 1998.
[14] At the bench conference, both parties stipulated that the videotape complied with the requirements of La. R.S. 15:440.5, discussed infra, and had been edited to comply with the Rules of Evidence.
[15] In denying this motion, the district court noted that, although the victim had tears in her eyes at one point during the viewing of the tape, there was no outburst or excessive display of emotion by the victim and the jurors did not appear to react in a way that would indicate they were upset by the victim's response to the tape.
[16] A substantially longer unedited tape, which was not available to the jury, was also viewed. In it, the victim makes, and in some cases also retracts, somewhat vague accusations that the defendant raped her on other occasions. The trial court denied the state's motion to introduce these prior rapes at a pre-trial Prieur hearing.
[17] Sergeant Jones testified that eighth-grader, R.R., was also considered a potential suspect after it was reported to the police that R.R. told his classmates that he committed the rape. However, Linda Gilmore, a teacher's assistant at the Jefferson Community School testified that R.R. was present in school on March 2, 1998. Lieutenant Thurman investigated further and found R.R.'s alibi supported by the school's principal, a coach, Ms. Gilmore, the school's attendance records, and by witnesses who told him they saw R.R. picked up for school by bus at 7:45 a.m. Sergeant Jones testified that R.R. is about 5' 3" with a lighter complexion and younger than any of the descriptions of the attacker.
[18] La. R.S. 15:440.4 provides as follows:

Method of recording videotape; competency
A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
(1) That such electronic recording was voluntarily made by the protected person.
(2) That no relative of the protected person was present in the room where the recording was made.
(3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.
(4) That the recording is accurate, has not been altered, and reflects what the protected person said.
(5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a licensed professional counselor, or an authorized representative of the Department of Social Services.
B. The department shall develop and promulgate regulations on or before September 12, 1984, regarding training requirements and certification for department personnel designated in Paragraph (A)(5) of this Section who supervise the taking of the protected person's statement.
[19] The defendant also argues in brief that even assuming the lack of objection barred direct review of the trial court's evidentiary ruling, "given the devastating impact of the videotape, to the extent the failure to object constitutes a waiver, it is clear that such a failure would constitute ineffective assistance of counsel." However, at oral argument, defense counsel specifically stated to the Court that it was not making an ineffective assistance argument at this stage of the proceedings. Thus, we do not consider whether lack of an objection constituted ineffective assistance of counsel and find that it does not provide grounds for us to consider defendant's unobjected to assignment of error.
[20] Although this Court never considered the constitutionality of the original act, in a string of cases the circuit courts of Louisiana upheld the statutes in cases in which the victim actually appeared in court and testified. See State v. Abbott, 29,497, (La.App. 2 Cir. 6/18/97), 697 So.2d 636, 640-41 (admission of videotape of interview between child victim and police officer does not violate confrontation principles when child and interlocutor both testify); State v. Gray, 533 So.2d 1242, 1248-49 (La. App. 4 Cir.1988) (videotaped testimony does not violate Confrontation Clause, at least when witnesses testify); State in the Interest of R.C., 514 So.2d 759, 761-65 (La.App. 2 Cir. 1987) (availability of witness to testify prevents statute from violating Confrontation Clause); State v. Guidroz, 498 So.2d 108, 110-111 (La.App. 5 Cir.1986) (defendant's right of confrontation not violated because defense counsel viewed the tape before trial and victim testified); State v. Feazell, 486 So.2d 327, 330-331 (La.App. 3 Cir.1986) (Confrontation Clause not violated when the state offered videotape in evidence as direct testimony and tendered witness in person for cross-examination); but cf. State v. Navarre, 498 So.2d 194, 196 (La.App. 1 Cir.1986) (admission of videotaped victim interview without allowing defendant to cross-examine the victim violates statute and confrontation principles). However, other courts considering the question have come to the opposite conclusion even in cases in which the victim was available to testify. See, e.g., Offor v. Scott, 72 F.3d 30, 33 (5th Cir.1995) ("Nor is it an answer [under the Confrontation Clause] that the defendant might have called the child in order to cross-examine.").
[21] In the companion cases, Davis v. Washington and Hammon v. Indiana, 547 U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court found it necessary to fashion a test, albeit an admittedly non-exhaustive one, Id. 126 S.Ct. at 2273, for the determination of whether statements should be classified as testimonial or non-testimonial. The Supreme Court held that:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate there is no such ongoing emergency, and that the primary purpose of interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id., 547 U.S. at ___, 126 S.Ct. at 273-74. The Court then applied this test in Davis and found that statements made to a 911 operator were non-testimonial because they constituted "a call for help against a bona fide threat" by a caller who "was facing an ongoing emergency" and they were elicited by the 911 operator to "resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past." Id., 547 U.S. at ___, 126 S.Ct. at 2274 (emphasis in original). The Court applied the new test in Hammon (the companion case) to find that statements made by a battered wife, who initially claimed that she was fine and nothing had happened, to an officer responding to a domestic disturbance call, were testimonial because "there was no emergency in progress; [the officer] had heard no arguments or crashing and saw no one throw or break anything, . . . and there was no immediate threat to [the victim's] person." Id., 547 U.S. at ___, 126 S.Ct. at 2278. The Court acknowledged that "a conversation which begins . . . to determine the need for emergency assistance . . . [can] evolve into testimonial statements, . . .", id., 547 U.S. at ___, 126 S.Ct. at 2277, but suggested that:
"[T]rial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through in limine procedure, they should redact or exclude the portions of any statement that have become testimonial,. . . . "
Id., 547 U.S. at ___, 126 S.Ct. at 2277-78.
Although not specifically enumerated as such in Crawford or in the companion cases that followed, it is difficult to contend that a child victim's videotaped accusation, which was obtained by the state in preparation for trial long after the emergency, as in the instant case, is anything other than clearly testimonial. The videotaped statement constitutes an out-of-court statement offered to prove the truth of the matter asserted, i.e., that the defendant raped the victim.
[22] See the unpublished appendix to this opinion for a discussion of the numerous other assignments of error in this case.
[23] The defendant contends further that Louisiana is also among a minority of jurisdictions worldwide and claims the legislature, in amending La. R.S. 14:42 to authorize capital punishment for aggravated rape of a child under the age of twelve, violated Article 42 of the American Convention on Human Rights, to which this country is a signatory. However, in Breard v. Greene, 523 U.S. 371, 377, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998), the Supreme Court held that "[e]ven were [inmate's] Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." Accordingly, this assignment of error lacks merit.
[24] The defendant also contends that La. Const. art. 1, ง 20 provides additional requirements of proportionality beyond that imposed by the Eighth Amendment. La. Const. art. 1, ง 20 provides:

ง 20. Right to Humane Treatment
Section 20. No law shall subject any person to euthanasia, to torture, or to cruel, excessive, or unusual punishment. Full rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense.
In State v. Perry, 610 So.2d 746 (La.1992), we held that "[t]he framers of our state constitution clearly intended for this guarantee to go beyond the scope of the Eighth Amendment in some respects and to provide at least the same level of protection as the Bill of Rights and the Fourteenth Amendment and all others." Indeed, distinct from the Eighth Amendment, Art. 1, ง 20 expressly prohibits "euthanasia," "excessive" punishment, and "cruel or unusual" punishment. However, for purposes of capital punishment for child rape, we find this language does not provide any additional protections beyond those provided by the Eighth Amendment. Therefore, our analysis will proceed according to Eighth Amendment jurisprudence.
[25] Later, in Stanford v. Kentucky, which held that executing an individual for crimes committed at 16 or 17 years of age did not violate the Eighth Amendment, the Court held that the Court's independent judgment had no bearing on the acceptability of a particular punishment under the Eighth Amendment. 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). However, as discussed infra, Stanford was later overruled by Roper v. Simmons, infra, in which the Court also reaffirmed its view prior to Stanford that it must exercise its own independent judgment to determine whether the death penalty is a disproportionate penalty.
[26] Defendant was tried, convicted, and sentenced under this version of the law. However, Acts 2003, No. 795, ง 1 substituted 13 years for 12 years in La. R.S. 14:42(A)(4), and Acts 2006, No. 178, ง 1, substituted 13 years for 12 years in La. R.S. 14:42(D)(2) to change the penalty provisions to conform to the definition of the crime.

La. R.S. 14:42 provides in full:
ง 42. Aggravated rape
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.
(5) When two or more offenders participated in the act.
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
B. For purposes of Paragraph (5), "participate" shall mean:
(1) Commit the act of rape.
(2) Physically assist in the commission of such act.
C. For purposes of this Section, the following words have the following meanings:
(1) "Physical infirmity" means a person who is a quadriplegic or paraplegic.
(2) "Mental infirmity" means a person with an intelligence quotient of seventy or lower.
D. (1) Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
(2) However, if the victim was under the age of thirteen years, as provided by Paragraph (A)(4) of this Section:
(a) And if the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury. The provisions of C.Cr.P. Art. 782 relative to cases in which punishment may be capital shall apply.
(b) And if the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The provisions of C.Cr.P. Art. 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.
[27] The United States Supreme Court denied certiorari, with Justices Stevens, Breyer, and Ginsberg, concurring in the result but reiterating the principle that the denial of a "petition for writ of certiorari does not in any sense constitute a ruling on the merits . . ." To underscore the point, the dissenters noted "an arguable jurisdictional bar" to the Court's review because the defendant had been "neither convicted of nor sentenced for any crime" and thus the court did not have before it a final judgment of a state court for purposes of review as a matter of 28 U.S.C. ง 1257(a). Id.
[28] Incidentally, the victim in Coker was actually a sixteen-year-old married woman.
[29] At least two current Justices, Scalia and Thomas, disagree that the meaning of the Eighth Amendment should be determined in accordance with the Court's "modern jurisprudence," which considers whether there is a "national consensus" that laws allowing certain executions "contravene our modern `standards of decency,'" and they particularly object to the Court's exercise of its subjective independent judgment to determine the meaning of the Eighth Amendment. Roper, 543 U.S. at 608-09, 125 S.Ct. 1183 (Scalia, J., dissenting, joined by Thomas, J. and Rehnquist, C.J.).
[30] The Court buttressed its conclusion in Roper that death was disproportionate to the particular class of offender under consideration by taking into account the overwhelming weight of international opinion disapproving of the death penalty for juvenile offenders. The Court thereby reaffirmed that reference "to the laws of other countries and to international authorities [is] instructive for its interpretation of the Eighth Amendment's prohibition of `cruel and unusual punishments.'" Roper, 543 U.S. at 575, 125 S.Ct. at 1198. The Court found it particularly instructive in Roper that the seven countries which had executed juvenile offenders besides the United States since 1990 (i.e. Iran, Pakistan, Saudi Arabia, Yemen, Nigeria, Democratic Republic of Congo, and China) had all since then "either abolished capital punishment for juveniles or made public disavowal of the practice." Roper, 543 U.S. at 577, 125 S.Ct. at 1199. The Court thus deemed it "proper that we acknowledge the overwhelming weight of international opinion against the juvenile death penalty, resting in large part on the understanding that the instability and emotional imbalance of young people may often be a factor in the crime . . . The opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our own conclusion." Roper, 543 U.S. at 578, 125 S.Ct. at 1200.

Former Chief Justice Rehnquist rejected the Court's consideration of the sentencing practices of other countries in determining a national consensus for Eighth Amendment purposes, arguing that the Court in Stanford v. Kentucky, 492 U.S. 361, 391, n. 1, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), explicitly rejected such consideration. Atkins, 536 U.S. at 325, 122 S.Ct. 2242 (Rehnquist, C.J., dissenting); Roper, 543 U.S. at 622, 125 S.Ct. 1183 (Rehnquist, C.J., dissenting).
[31] Intellectual deficits and adaptive disorders of the former, and a lack of maturity and a fully developed sense of responsibility of the latter, tend to diminish the moral culpability of the mentally retarded and juvenile offender, with important societal consequences. Retribution "is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity[,]" Roper, 543 U.S. at 571, 125 S.Ct. at 1196, or by reason of the "diminished capacities to understand and process information" of the mentally retarded. Atkins, 536 U.S. at 318-19, 122 S.Ct. 2242. For the same reasons, the mentally retarded and the juvenile offender "will be less susceptible to deterrence." Roper, 543 U.S. at 571, 125 S.Ct. at 1196; see Atkins, 536 U.S. at 320, 122 S.Ct. at 2251 ("[I]t is the same cognitive and behavioral impairments that make these defendants less morally culpable . . . that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.").
[32] Thus, for some 40 years the Georgia courts have followed a classification theory similar to the one adopted by this Court for a few years following the decision in Furman v. Georgia, 408 U.S. 237, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Under that approach, and despite the invalidity of the death penalty after Furman, capital cases remained "capital" for all procedural purposes, including the requirement of a unanimous 12-person jury, State v. Holmes, 263 La. 685, 269 So.2d 207 (1972); State v. Flood, 263 La. 700, 269 So.2d 212 (1972).
[33] See Coker, supra, 433 U.S. at 597, 97 S.Ct. 2861 ("Short of homicide, [rape] is the ultimate violation of self.")
[34] For example, Meister lists Missouri as a jurisdiction permitting non-homicide capital punishment. 45 Ariz. L.Rev. at 211, n. 131. However, Cornell places Missouri in the homicide-only category, D'Avella, Note, 92 Cornell L.Rev. at 130, n. 6. On the other hand, Cornell lists Washington as a homicide-only capital jurisdiction while Meister correctly places it in the non-homicide category. See Wash. Rev.Code Ann. ง 9.82.010 (West 2006 Supp)(treason). Kearns states that fourteen states allow the death penalty for non-homicide crimes. 58 S.C. La. Rev. 509, 520, n. 9.

More importantly, for present purposes, Cornell lists Florida as among the states which provide capital punishment for the rape of a child. D'Avella, Note, 92 Cornell L.Rev. at 150, n. 152. In fact, Fla. Stat. Ann. ง 794.011(2)(a)(West 2000), continues to provide that "[a] person 18 years of age or older who commits sexual battery upon, or in an attempt to commit sexual battery injures the sexual organs of, a person less than 12 years of age commits a capital felony . . ." However, as this Court noted in Wilson, the Florida Supreme Court struck this provision down in Buford v. State, supra (applying Coker), and despite its nominal capital classification, child rape is punishable in Florida by a sentence of life imprisonment without parole. Adaway v. State, 902 So.2d 746, 748 (Fla.2005); see Fla. Stat. Ann. ง 775.082 (West 2000)(in the event the death penalty in a capital felony is held unconstitutional by the United States Supreme Court or the Florida Supreme Court, the district court shall sentence the offender to life imprisonment without parole). Nonetheless, Florida ranks among the non-homicide capital jurisdictions because of its strict drug laws. See Fla. Stat. Ann. งง 893.135, 921-142 (see infra at pp. 787-88).
[35] U.S. Department of Justice, Bureau of Justice Statistics, Capital Punishment 2003 at p. 2 (Washington, DC: GPO 2004), http://www. ojp.usdoj.gov/6js/pub/pdf/cp03pdf (accessed February 21, 2007).
[36] However, the last execution for espionage and treason under state law occurred in 1862 in Texas. Federal law providing capital punishment for the same kinds of crimes all but preempts the field, see, e.g., 18 U.S.C. 794 (espionage); 18 U.S.C. 2381 (treason), and even then, the last persons executed under federal law for espionage and treason were the Rosenbergs in 1953. See http://en. wikipedia.org/wiki /Capitalโpunishmentโ inโtheโUnitedโStates (accessed February 21, 2007).
[37] For example, in South Dakota, the crime of rape, involving either an adult woman or a child, becomes a capital offense if it also constitutes kidnapping as defined in (ง) 22-19-1(2), i.e., abduction "[to] facilitate the commission of any felony or flight thereafter . . ." However, exactly that scenario led to the decision in Eberheart and may prompt an identical response from the Supreme Court today.
[38] We reject the defendant's policy arguments that commentators have speculated that the threat of capital punishment would encourage a rapist to murder his victim, that subjecting a child rape victim to a capital trial increases the trauma to the victim, and that there is an elevated likelihood of wrongful conviction in cases of rape when the victim is a child. Policy arguments tend to be facile, speculative, and political in nature. For each policy argument advanced by anti-capital punishment commentators, equally valid responses have been offered by pro-capital punishment commentators. See, e.g., Yale Glazer, Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute, 25 Am.J.Crim.L. 105-12 (1997-1998). Thus, we consider these policy arguments to be largely irrelevant for Eighth Amendment purposes. Social policy arguments are for the legislature to consider, and whether a particular law represents good or bad policy has little bearing on the question of whether it is nevertheless constitutional. Further, as we stressed in Wilson, regardless of a victim's reluctance to come forward against a child rapist, children are a class of persons who need special protection.
[39] As we further explained in Wilson:

Contemporary standards as defined by the legislature indicate that the harm inflicted upon a child when raped is tremendous. That child suffers physically as well as emotionally and mentally, especially since the overwhelming majority of offenders are family members. Louisiana courts have held that sex offenses against children cause untold psychological harm not only to the victim but also to generations to come. "Common experience tells us that there is a vast difference in mental and physical maturity of an adolescent teenager . . . and a pre-adolescent child . . . It is well known that child abuse leaves lasting scars from generation to the next . . . such injury is inherent in the offense." State v. Brown, 660 So.2d 123, 126 (La.App. 2 Cir.1995). ". . . Aggravated rape inflicts mental and psychological damage to its victim and undermines the community sense of security. The physical trauma and indignities suffered by the young victim of this offense were of enormous magnitude . . ." State v. Polkey, 529 So.2d 474 (La.App. 1 Cir.1988). ". . . the child's tender age made her particularly vulnerable and incapable of resisting . . . considering acutely deleterious consequences of conduct on an eight-year-old child." State v. Jackson, 658 So.2d 722 (La.App. 2 Cir.1995).
685 So.2d at 1070.
[40] As stated in footnote 26, supra at p. 780-81, La. R.S. 14:42(A)(4) was amended in 2003 to substitute 13 years for 12 years.

Aggravated rape also is where anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because (1) the victim resists the act to the utmost, but whose resistance is overcome by force, (2) the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution, (3) the victim is prevented from resisting because the offender is armed with a deadly weapon, (4) two or more offenders participated in the act, and (5) the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
[41] As stated in footnote 26, supra at p. 780-81, La. R.S. 14:42(D)(2) was amended in 2006 to substitute 13 years for 12 years.
[42] In Lowenfield, the issue was whether a sentence of death may validly rest upon a single aggravating circumstance under La. C.Cr.P. art. 905.4 that is a necessary element of the underlying offense of first-degree murder under La. R.S. 14:30.1. The Court answered in the affirmative.
[43] In fact, the present capital rape sentencing scheme as amended in 2003 actually does allow for narrowing at the sentencing phase as well, as the underlying statute narrows those child rapists eligible for the death penalty to those who rape children under 13, and the sentencing statute provides as an aggravating factor that the child be under 12.
[44] We note that the author of this opinion concurred in Wilson, writing separately to express his view that "the Legislature should immediately amend Articles 905 et seq. of the Code of Criminal Procedure (especially Article 905.2) to clarify the sentencing procedure for an aggravated rape case in which the death sentence may be imposed." Wilson, supra at 1074 (Victory, J., concurring). This was directed at the fact that La.C.Cr.P. art. 905.2, which governs capital sentencing hearings, provided that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." (Emphasis added.) The statute had no provisions for a capital case where the victim survived. This statute was amended by Acts 2001, No. 280, ง 1 to provide for this and now reads "The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates. The victim or his family members, friends and associates may decline to testify but, after testifying for the state, shall be subject to cross-examination." (Emphasis added.) Thus, the concerns the author had in 1996 have now been rectified.
[45] In one case, the state opted not to seek the death penalty because the sexual abuse spanned the period within which the aggravated rape statute was amended.