STEWART, J.
liThe defendant, Joshua Vallo, was convicted by a jury of aggravated incest. The trial court sentenced him to 50 years’ imprisonment at hard labor, with credit for time served but also with the first 25 years of the sentence to be served without probation, parole, or suspension of sentence. The defendant appealed, assigning as error a violation of his constitutional right of confrontation by the admission of the victim’s videotaped interview where the victim refused to answer questions on cross-examination regarding the alleged offense. The defendant also assigned as error the excessiveness of his sentence. Because we find merit to the first assignment of error and for reasons explained in this opinion, we reverse the defendant’s conviction and sentence and remand for further proceedings.
*270 FACTS
By bill of information Sled on July 21, 2010, the defendant was charged with aggravated incest of his stepdaughter, M.M., between the dates of April 1, 2010, and June 3, 2010. M.M. was eight at the time of the offense and lived with her mother and the defendant. The matter proceeded to a jury trial on April 23-25, 2012. The following facts were adduced at trial.
The alleged offense came to light on May 30, 2010, when M.M. told her aunt, Meiko Prevo, and Prevo’s partner, Marva Key. Key, not Prevo, testified at trial. According to Key, M.M. stated that she had something to tell her. The child then revealed that the defendant had been touching her all over — “touching her top and touching her bottom, her private area.” Prevo reported the allegation to the Cullen Police Department, which began Ran investigation. The state immediately removed M.M. from her mother’s custody and placed her with her father, Milton Lee Mosby, Sr.
On June 1, 2010, Mosby and Officer Leon Thirdgill of the Cullen Police Department accompanied M.M. to the Gingerbread House in Shreveport where she was questioned by a forensic examiner. Officer Thirdgill supervised the interview by listening over speakers and communicating by walkie-talkie with the interviewer, who wore an earpiece. The interview was videotaped, and Officer Thirdgill testified that he viewed the video prior to trial. He stated that the video was not altered, that it reflects what M.M. said during the interview, that no attorneys were present during the interview, and that the voices on the video are those of the people who were there during the interview. In conjunction with Officer Thirdgill’s testimony and without any objection by the defense, the state played the video for the jury. Both Officer Thirdgill and M.M.’s father denied telling her what to say during the interview.
The video shows M.M. and the forensic examiner. While M.M. was clearly hesitant to talk and slow to respond to the questions, she did eventually state that “Josh” had been touching on her and that it happened more than once. She stated that the touching occurred on her whole body and under her clothes. It happened in her room, her brother’s room, and the living room. She stated that no one saw him do these things to her.
Later in the interview, M.M. became more specific about what happened. She said that Josh used his fingers to touch her leg, her “bottom,” and her “privacy.” He did this touching under her clothes and 1..¡underwear. She stated that he would stick his finger in her privacy and bottom and lick her privacy. He would also lick and bite her nipples. M.M. said that he tried to make her touch his privacy, but she would not do it. When asked if Josh said anything to her while doing these things, M.M. replied that he would say “I got your back, b.a.b.y.” and “I love you.” M.M. also recalled that he would have “some kind of grease” on his hands and that he told her it “would make it feel better.” She said that he got the grease from his bathroom. Finally, M.M. recalled watching a movie on the television called “Booty Talk” with Josh. She said that boys and girls were touching each other and that she closed her eyes during the movie.
M.M. told the interviewer that Josh told her not to tell anyone. She said these things happened while her mother was at work or asleep and while her brother was asleep as well. When asked about whether she told anyone what was happening, M.M. said that she told her brother and then her cousin Ebony. She went on to say that she told her mother and other *271 family members. She said that her mother was mad because Josh touched her and said that she should have told her about it. Lastly, the interviewer had M.M. identify the body parts she talked about on a drawing, which was introduced as State’s Exhibit 1.
The state called M.M. to testify at trial. M.M. stated that she was 10 and that she lived with her father. M.M. then answered “yes” or “no” to questions posed by the prosecutor. She indicated that she recalled talking to the prosecutor and going to his office. She indicated that she understood the truth and that she had to tell the truth in court. She affirmed that she Lwatched the video at the prosecutor’s office, that it was her on the video, and that what she said on it was true. She denied that anyone told her what to say on the video. She affirmed that she knows the defendant, that he was married to her mother, and that she had lived with him and her mother in Cullen. Following these preliminary questions, the state again played the Gingerbread video for the jury.
After watching the video, M.M. answered “yes” when asked whether what she said on it was true, and she answered “no” when asked whether anyone had told her what to say. She also answered “yes” when asked if she recognized two documents from the interview, one on which she identified male and female body parts and the second on which she wrote the names of her family, including the defendant. These were introduced into evidence as State’s Exhibits 1 and 2. Then, without any objection by the defense, the state offered the Gingerbread video into evidence as State’s Exhibit 3.
On cross-examination, M.M. again indicated that she understood the difference between the truth and a lie and that she had not told any lies. She also indicated that she could keep straight in her mind the time periods when she lived with her mother and the defendant, and when she went to live with her father. She testified that she was in the third grade at the time of trial and that she was nine years old when she went to live with her father. She testified that she called the defendant “Josh,” and she answered “yes” when asked whether she spoke truthfully when she said what he did to her. She testified that she told her cousin, “grandpapa,” and “auntie,” whom she identified as “Marva,” about what the defendant did to her. When asked |Rif this was before or after she went to live with her father, she answered, “After-before.” She then testified that she talked to her father at the police station and told him that “[h]e was touching on me.” M.M. then answered “no” when asked whether anyone had told her what to say. She knew that the police station was in Cullen, and she testified that she spoke with the police officers and then went to live with her father in Haynesville. Later in her testimony, she denied that she had ever been to her father’s house before she went to live with him.
When asked what happened next, M.M. indicated that she did not remember. However, she did remember going to the Gingerbread House. She also remembered going to a doctor, but she did not remember the examination. Defense counsel then asked her to forget about the video and answer the questions based on her memory. The state objected, and a bench conference took place. The court directed defense counsel to rephrase the question and then M.M. was allowed a short break before continuing.
Upon resuming, defense counsel asked M.M. to tell what the defendant did to her. M.M. stated, “He was touching on me.” When asked where he was touching, M.M. *272 stated, “On my whole body.” To further questioning about where on her body, she answered, “On my legs.” She would not respond to additional questions about the touching. Defense counsel asked M.M. whether she would be more comfortable answering if counsel was seated, but M.M. indicated that she should “Stand there.” The trial court then directed M.M. to listen to the questions and answer them. Defense counsel again asked M.M. to say if the defendant touched her [^anywhere else or to say if he did not. The state objected and another bench conference was held. The state argued that the Gingerbread video was M.M.’s direct testimony and that she already testified in it about what exactly the defendant did to her. After noting M.M.’s age and that she might be having a difficult time answering questions about where she was touched, the court then directed defense counsel to ask simple questions that she would understand and that require a direct answer.
When questioning resumed, defense counsel again asked M.M. where on her body did the defendant touch her. M.M. answered, “My bottom.” She responded “no” when asked whether she had a hard time remembering. She would not answer when asked if anything would make it easier for her to answer the questions. Defense counsel then asked some general questions about school before returning to questions about the Gingerbread House interview. M.M. answered “yes” to indicate that she remembered that day and the things that the defendant did to her, but she would not answer when asked to tell what happened to her.
On redirect, M.M. again answered “yes” to indicate that she had viewed the video and what she said on it was true. She would not answer when asked whether it was hard for her to answer questions in front of the defendant or out loud, or whether she was afraid. M.M. would not answer further questions, even when posed by the trial judge. The state ended its redirect and rested its case.
When trial resumed the next day, the state made a new offer to the defendant on the record. The defendant turned it down and took the stand. [ 7The defendant asserted that he had been falsely accused and denied doing the things related by M.M. on the Gingerbread video. He suggested that someone, either her father or her aunt, told her to say those things and coached her. He disputed Mosby’s claim that he never saw M.M. before she went to live with him, and he stated that he argued with M.M.’s aunt from “time to time.” He believed that the explicit details provided by M.M. on the video and the time it took her to answer questions indicated that she was being prompted or lying.
By a vote of 11 to 1, the jury found the defendant guilty of aggravated incest. The sentencing hearing took place on August 17, 2012. The trial court had reviewed the presentence investigation report. Mosby asked the trial court to impose a life sentence due to the impact of what happened to M.M. and her family. The trial court set forth various factors considered by it, including the fact that the defendant was a first felony offender. The trial court noted that the victim was the defendant’s stepdaughter and he had the opportunity to confront her when she testified at trial. The trial court expressed its opinion that there is not much chance of rehabilitation from this type of crime and that such offenders tend to offend again. Noting how seriously it takes matters when children are hurt and its desire to make certain there will be no other victims, the trial court sentenced the defendant to 50 years at hard labor, with 25 years without proba *273 tion, parole, or suspension of sentence. He was allowed credit for time served.
On appeal, the defendant asserts two assignments of error concerning the alleged violation of his Sixth Amendment right of confrontation and the |sexcessiveness of the sentence. Because we find merit to the first assignment of error, the assignment regarding excessiveness of the sentence will not be addressed.
DISCUSSION
In his first assignment of error, the defendant asserts a violation of his constitutional right to confront his accuser. He asserts that the Gingerbread video was admitted without him being able to effectively cross-examine M.M. because she refused to answer questions at trial concerning the alleged offense. He asserts that M.M.’s refusal to answer questions made her essentially “unavailable” to testify. He further asserts that the lack of effective cross-examination of the accuser at trial easts substantial doubt on the fact-finding process, particularly as the video was the basis of the state’s case against him. In support of his argument, the defendant cites State in the Interest of R.C., 514 So.2d 759 (La.App. 2d Cir.1987), writ denied,, 516 So.2d 128 (La.1987), discussed infra. Recognizing that there was no contemporaneous objection to the introduction of the video, the defendant asserts that this error is subject to review because it affects a substantial right.
The state counters that it and the trial court complied with the statutory requirements for admission of the video into evidence and that M.M. was subject to cross-examination by defense counsel.
As provided by La. C. Cr. P. art. 841, an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. The contemporaneous objection rule serves two purposes. It | ¡prevents a defendant from withholding objections to errors with the intention of urging such errors on appeal, and it promotes judicial efficiency. State v. Mart, 419 So.2d 1216 (La.1982); State v. Thomas, 27,507 (La.App.2d Cir.12/6/95), 665 So.2d 629, writ denied, 96-0119 (La.4/8/96), 671 So.2d 383.
Even in the absence of a contemporaneous objection, an error that is discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence is subject to review on appeal. La. C. Cr. P. art. 920(2). Additionally, the supreme court has carved out a jurisprudential exception similar to the “plain error” rule provided in F.R.C.P. Rule 52(b). Thomas, supra. However, this rule is of limited applicability, not general application. Id. It applies “where the relevant errors substantially affected the fairness of the proceeding and the reliability of the fact-finding process.” Id., 27,507 at p. 7, 665 So.2d at 633.
The Confrontation Clause of the Sixth Amendment of the U.S. Constitution guarantees an accused the right to be confronted with the witnesses against him. This is a bedrock procedural guarantee applicable in both federal and state prosecutions. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Sixth Amendment safeguards the right of the defendant to confront his accuser and to subject the accuser’s testimony to rigorous testing in an adversarial proceeding before the trier of fact. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); State v. Carper, 45,178 (La.App.2d Cir.6/9/10), |in41 So.3d 605, writ denied, 10-1507 (La.9/3/10), 44 So.3d 708. See also La. Const. Art. I, § 16.
*274 Here, the defendant asserts that he was deprived the opportunity to confront his accuser and to subject her testimony concerning the offense to rigorous testing through cross-examination due to her refusal to answer questions about the offense. The defendant’s Sixth Amendment right to confrontation is clearly a substantial right guaranteed by the federal and state constitutions. Considering that the state’s case was based almost exclusively on the victim’s testimony, the claim that the defendant was deprived of the right of confrontation due to the victim’s unavailability resulting from her refusal to answer questions about the offense is, if correct, one that would have substantially affected the fairness of the proceedings and the reliability of the fact-finding process. Therefore, we will address the assignment of error notwithstanding the neglectful failure of defense counsel to lodge any objections concerning the playing and admission of the Gingerbread video or M.M.’s testimony.

Applicable Law:

La. R.S. 15:440.1 et seq., authorize the videotaping of statements by protected persons[1] who are victims of rape or have otherwise been physically or sexually abused and the admission of such statements in evidence as an exception to the hearsay rule. La. R.S. 15:440.2 and R.S. 15:440.3. The purpose of this law is to allow for the prosecution of persons | Hwho commit such crimes with minimal additional intrusion into the lives of the protected persons. La. R.S. 15:440.1.
For the videotape to be considered competent evidence, it must be “satisfactorily proved” that (1) it was voluntarily made by the protected person; (2) no relative of the protected person was present in the room where the recording was made; (3) the recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement; (4) the recording is accurate, has not been altered, and reflects what the protected person said; and (5) the taking of the statement was supervised by a physician, social worker, law enforcement officer, or other authorized person listed in the statute. La. R.S. 15:440.4.
Admissibility of a videotaped statement is governed by La. R.S. 15:440.5, which states in relevant part:
A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
(1) No attorney for either party was present when the statement was made;
(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;
(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
(5) Every voice on the recording is identified;
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;
11g(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and
*275 (8) The protected person is available to testify.
(B) The admission into evidence of the videotape of a protected person as authorized herein shall not preclude the prosecution from calling the protected person as a witness or from taking the protected person’s testimony outside of the courtroom as authorized in R.S. 15: 288. Nothing in this Section shall be construed to prohibit the defendant’s right of confrontation. [Emphasis added.]
Before addressing the issue of whether the admission of the Gingerbread video in evidence violated the defendant’s right of confrontation, we must address the procedure utilized by the state in presenting it to the jury. The state played the Gingerbread video for the jury in conjunction with the testimony of Officer Thirdgill, who testified before M.M. was called as a witness by the state. Officer Thirdgill testified that he transported M.M. to the Gingerbread House and that he supervised the interview. He testified that the video is an accurate reflection of what happened during the interview. He testified that no lawyers were present at the interview but that M.M.’s father was present and had had M.M. in his custody since May 31, 2010.
The record shows that the Gingerbread video was played for the jury before the statutory competency and admissibility requirements were proved, satisfactorily or otherwise. There was no showing that M.M.’s father was not present in the room where the recording was made. Officer Thirdgill did not testify as to where M.M.’s father was during the interview, and the recording shows only that part of the room where M.M. and the interviewer sat. There was also no showing that the recording was 1 ^voluntarily made by the protected person. The state did not satisfactorily prove the Gingerbread video to be competent evidence under La. R.S. 15:440.4 prior to its presentation to the jury. The state also failed to establish that M.M., the protected person, was available to testify as required by La. R.S. 15:440.5 before presenting it to the jury during the testimony of Officer Thirdgill.
Louisiana’s special procedures for protecting children who are victims of abuse contain strict requirements that are meant to ensure that the rights of defendants to confront adverse witnesses and test the reliability of their testimony are not compromised. State v. Kennedy, 05-1981 (La.5/22/07), 957 So.2d 757, cert. granted, 552 U.S. 1087, 128 S.Ct. 829, 169 L.Ed.2d 625, judgment reversed on other grounds, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008)[2], modified on denial of rehearing, — U.S.-, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008), on remand, 2005-1981 (La.11/21/08), 994 So.2d 1287. Jurisprudence demands that these special procedures are to be followed with exactitude. Carper, supra. The state’s failure to satisfy these strict requirements prior to playing the Gingerbread video at trial is an error that violates the substantial rights of the accused and the fundamental requirements of due process.[3]
*276 We also find merit to the defendant’s assignment of error concerning 114the violation of his Sixth Amendment right of confrontation due to M.M.’s unwillingness to answer questions about the alleged offense. In Carper, supra, this court conducted a thorough survey of United States Supreme Court and federal jurisprudence addressing the Confrontation Clause, particularly its requirements concerning the admission of out-of-court statements.[4] In Crawford, supra, the United States Supreme Court rejected its prior pronouncement in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2581, 65 L.Ed.2d 597 (1980), that a witness’s out-of-court statement may be admissible so long as there are “adequate indicia of reliability — i.e. falls within a ‘firmly rooted hearsay exception’ or bears ‘particularized guarantees of trustworthiness.’ ” Crawford, 541 U.S. at 42, 124 S.Ct. at 1859. Instead, the Crawford court determined that testimonial hearsay statements may be admissible only when the declarant is unavailable to testify and the defendant has had a prior opportunity for cross-examination. Id., 541 U.S. at 59, 124 S.Ct. at 1369. The court explained that the Confrontation Clause is a procedural, rather than a substantive, guarantee and that its “ultimate goal is to ensure reliability of evidence.” Id., 541 U.S. at 61, 124 S.Ct. at 1370. Explaining further, the court stated, “It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.” Id.
More recently in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court held that, without | lflthe in-court testimony of the analysts, the admission into evidence during criminal proceedings against the defendant of certificates by state laboratory analysts stating that the substance in bags seized by police contained cocaine violated the defendant’s Sixth Amendment right to confront the witnesses against him. Citing Crawford, supra, the Supreme Court found that the analysts were “witnesses” for Sixth Amendment purposes and that their certificates were essentially affidavits and thus testimonial statements. Therefore, absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross-examine them, the defendant was entitled to confront them at trial. Melendez-Diaz, 557 U.S. 305, 129 S.Ct. at 2532. Notably, the Supreme Court rejected the argument that the defendant could have subpoenaed the analysts and thus confronted them at trial. As stated, “[t]he Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court.”[5] Id., 557 U.S. at 324, 129 S.Ct. at 2540.
Turning to the jurisprudence of this state, State in the Interest of R.C., supra, involved the adjudication of a juvenile for the attempted aggravated rape of a five-year-old child. The victim was called by the state as a witness at the adjudication. *277 She answered some general questions by which she identified the defendant and indicated that she had told her mother and the forensic 11fiinterviewer about the incident. However, she refused to answer questions in the courtroom about the incident, stating that she did not want to tell about it all over again. Though the defendant objected to the admission of the videotape, the court deferred its ruling until it viewed the tape and the victim was cross-examined. On cross-examination, she answered some questions about how long she had known the defendant and where her parents were when the incident took place. She testified that the defendant pulled her pants down, but she would not talk further about the incident and said that she forgot. The trial court then ruled the videotape inadmissible. That ruling was affirmed on appeal on the basis that the child’s refusal to answer questions about the offense rendered her unavailable at trial within the meaning of La. R.S. 15:440.5.
In its analysis, this court stated that every one of the requirements of La. R.S. 15:440.5 must be satisfied in order for the video to be admitted. The statutory scheme mandates that the child (protected person) must be available to testify. The court noted that this requirement “is absolutely essential to provide for constitutional confrontation and cross-examination.” Id., at 1355. The court found that the victim’s refusal to talk about alleged offense meant that she was not available for effective cross-examination and that “[e]ross-examination cannot be effective when it is not permitted to cover the facts of the alleged offense.” Id., at 1356. The court also noted that the victim’s videotaped interview “lodged a devastating accusation against the defendant” and that her refusal to testify denied him the opportunity to probe the truthfulness of her allegations. Id.
|17In State v. Guerra, 36,347 (La.App.2d Cir.12/18/02), 834 So.2d 1206, writ denied, 03-0072 (La.4/25/03), 842 So.2d 398, the defendant’s appeal urged that the victim’s videotape should have been inadmissible, in part, due to the victim’s refusal to answer certain questions. Finding that the victim was “sufficiently available to testify,” this court found no error in the admission of the videotape. The court noted that, unlike the victim in R.C., supra, the victim here did not refuse to testify, though some of her answers were not responsive to the questions. The court noted that the defense viewed the videotape prior to trial and had the opportunity to question the victim on cross-examination, but chose not to pursue answers to questions regarding the offense. The court found no abuse of discretion in allowing introduction of the video and concluded that any error in its omission was harmless. Notably, the state’s case included “a plethora of direct evidence” and medical evidence in addition to the victim’s taped statement and testimony at trial. Guerra, 36,347 at p. 14, 834 So.2d at 1214.
In Carper, supra, the defendant’s conviction for aggravated rape and molestation was reversed on appeal on the grounds that the victims’ Gingerbread interviews were admitted into evidence without any testimony from the young victims, who were not called to the stand. The court found that the interviews were the “linchpin” of the state’s case and that the state’s failure to call the children to the stand was a “fatal error to the prosecution.” Id., 45,178 at p. 22, 41 So.3d at 617. The court concluded that the admission of the taped interviews, without the defendant being afforded the | ^opportunity to cross-examine the victims, violated his right of confrontation under the Sixth Amendment.
*278 On remand, the defendant was tried and convicted again. Both victims testified at trial and their Gingerbread interviews were admitted into evidence. His conviction was affirmed in State v. Carper (Carper II), 47,409 (La.App.2d Cir.11/14/12), 107 So.2d 118. The opinion notes that the defendant had the opportunity to cross-examine both victims at trial.
In Kennedy, supra, the defendant was convicted of the aggravated rape of his eight-year-old stepdaughter. At trial, the victim testified on direct and cross-examination, and her videotaped interview was offered into evidence by a joint stipulation of the parties. The victim answered some general questions but then lost her composure when asked to tell what the defendant did to her. After a recess, the video was played while she was on the stand, then questioning resumed. The opinion recounts her testimony from this point in full and shows that she answered numerous questions about what happened after the defendant raped her. She answered “yes” when asked whether everything she said on the video was true and whether the defendant was the person who raped her. On appeal, the defendant argued that the statutory provisions authorizing use of the video are unconstitutional and that it was admitted into evidence in violation of the statute because the victim was unavailable, due to poor memory, for cross-examination and simply adopted her videotaped statement.
The supreme court rejected the first argument, finding it “clear that La. R.S. 15:440.5 is not facially unconstitutional as it specifically requires |19as a condition of admissibility that ‘the protected person is available to testify.’ ” Id., 05-1981, p. 27, 957 So.2d at 777. The court then examined whether' the victim was “available to testify” for purposes of admitting the videotape into evidence. The court noted that the defense had stipulated to the admissibility of the video and stated that it had no objection. Nor did the defense object on the basis of the victim’s unavailability due to poor memory. The court noted that a witness who is physically present in the courtroom may still be “unavailable” as a witness,[6] and that while the Confrontation Clause guarantees an opportunity for effective cross-examination, it does not guarantee effective cross-examination in whatever way or to what extent the defendant might wish.[7] Id., 05-1981, p. 27-28, 957 So.2d at 757.
Applying these principles, the supreme court found that the victim was not unavailable for purposes of the statute or the defendant’s right of confrontation. The court noted that the victim answered the vast majority of the questions asked, even though she did not recall meeting certain people during the investigation or making an initial videotaped interview, which was introduced by the defense at trial. She identified the defendant as the rapist. She testified about what occurred the morning of the rape and the defendant’s subsequent actions to hide his crime. The court concluded that the victim was able to defend or explain her videotaped statement at trial.
1 Analysis
In light of the above discussion of the applicable law, we must determine whether the admission of M.M.’s Ginger *279 bread video violated the defendant’s Sixth Amendment right of confrontation because M.M. was “unavailable” due to her refusal to answer questions at trial. On the Gingerbread video, M.M. appears reluctant to talk, but she reveals, during the course of questioning, specific details about what the defendant did to her. Her testimony on the video is compelling.
At trial, she testified that what she said on the video was true, but when questioned about what the defendant did to her, M.M. was mostly unwilling to talk about the offense as demonstrated by the following exchange on cross-examination:
Q. Okay. Now my question to you is I want you to tell me what Josh did to you.
A. He was touching on me.
Q. Okay. Where was he touching you?
A. On my whole body.
Q. On your whole body. Okay. Did he touch you in places that would have been inappropriate? Do you know what that word means? Well, just name the places on your body that he touched then. Can you do that?
A. On my legs.
Q. Where else?
(WITNESS NOTANSAVERING)
Q. M.M., did — did Josh touch you anywhere else?
(WITNESS NOT ANSAVERING)
121 After the court tried to make M.M. more comfortable and held a sidebar conference, cross-examination resumed as follows:
Q. Okay, [M.M.], can you think back to the time before you went to live -with your daddy and a time when you said that Josh Vallo did things to you? Are you able to think back to that time?
A. Yes.
Q. Okay. And you said that you he (sic) had touched you. Okay. And you have told people that he touched you. Can you please tell me where on your body he touched you?
A. My bottom.
Q. Do you have a hard time remembering this? Just yes or no.
A. No
Q. Okay. Can you tell me why it’s hard for you to talk about it and answer it? Is there anything I can do to make it easier for you to answer the questions?
(AVITNESS NOTANSAVERING)
Defense counsel then asked some general questions about school, to which M.M. responded with mostly “yes” or “no” answers. AVhen defense counsel again asked if she remembered the things that happened to her, M.M. responded, ‘Tes.” However, when counsel asked M.M. to tell anything about what happened, M.M. would not respond. Thus ended cross-examination.
This case is remarkably similar to State in the Interest of R.C., supra, and distinguishable from Guerra, supra, and Kennedy, supra. Like the victim in State in the Interest of R.C., supra, M.M. answered some questions but largely refused to talk about the incident. This is not a case like Guerra, supra, where the defense did not pursue answers to questions about the offense. Here, ^defense counsel did repeatedly attempt to ask M.M. about what specifically happened to her and made efforts to make M.M. more comfortable in the courtroom surroundings so that she could answer the questions. M.M. stated more than once that she could remember what happened, but she would not answer questions about it, as demonstrated by the testimony recounted above. The victim in Kennedy, supra, as stated in the opinion, answered the “vast majority” of the ques *280 tions asked of her. That opinion does not indicate that she was asked or refused to answer questions on cross-examination about the offense. Moreover, the state’s cases in both Guerra, supra, and Kennedy, supra, were not solely dependent on the statements of the victims. In both cases, the state presented a plethora of other corroborating evidence. Here, M.M.’s Gingerbread video is the linchpin of the state’s case and practically the sole evidence against the defendant. Perhaps that is why the state endeavored to present the Gingerbread video multiple times to the jury.[8]
Cross-examination cannot be effective when it is not allowed to cover the facts of the alleged offense. Carper, supra; State in the Interest of R.C., supra. The record shows that the defendant was not provided an opportunity for effective cross-examination due to M.M.’s unwillingness to answer most of the questions posed about the alleged offense. Neither the efforts by defense counsel nor the trial court’s attempts to coax the young victim into providing answers about the offense elicited responses from her. Close review of the transcript shows that M.M. chose which questions she would | ^answer and that she chose not to answer questions about the specifics of the offense.
We note that the state argued at trial that M.M.’s answers to questions about the offense were sufficient and that her Gingerbread videotape was her testimony. However, the statutory scheme which allows for the use of a protected person’s prior recorded statement at trial demands that the protected person be “available to testify.” La. R.S. 15:440.5(A)(8). That same statute mandates that “[njothing in this Section shall be construed to prohibit the defendant’s right of confrontation.” The state’s argument would render these provisions essentially meaningless.
As in State in the Interest of R.C., supra, M.M.’s Gingerbread video “lodged a devastating accusation against the defendant.” This is forcefully demonstrated by the sentence of 50 years at hard labor, 25 of which are without benefits, imposed by the trial court on this true first offender, who was 20 years old when the offense occurred. The victim’s refusal to testify about the offense denied him the opportunity to test the truthfulness of her recorded statement through confrontation and cross-examination.
Here, where the Gingerbread video was the linchpin of the state’s case, where the victim was “unavailable” because she would not provide answers, other than the most general, to questions about what the defendant did to her, and where the state failed to comply with the strict statutory requirements for establishing the video as competent evidence and for its admissibility at trial, we are constrained to find that the admission of the Gingerbread video into evidence constituted a violation of the defendant’s I^Sixth Amendment right of confrontation. Accordingly, we must reverse his conviction and sentence and remand for further proceedings.
CONCLUSION
For the reasons set forth in this opinion, the defendant’s conviction and sentence are reversed and vacated. The matter is remanded to the district court for further proceedings.
REVERSED and REMANDED.
DREW, J., concurs with written reasons.

. Protected person is defined as any person who is a victim of a crime or a witness in a criminal proceeding and who is either under the age of 17 or has a developmental disability as defined in R.S. 28:451.2(12). La. R.S. 15:440.2(C).

. Upon granting certiorari, the U.S. Supreme Court held that the Eighth Amendment of the U.S. Constitution bars the death penalty for rape of a child where the crime did not result, nor was intended to result, in the death of the victim.

. Though not specifically required by the statute, a pretrial evidentiary hearing to determine whether the protected person’s videotaped testimony meets the statutory requirements and is admissible into evidence may be the best practice for addressing the requirements under La. R.S. 15:440.4 and 440.5. For example, see State v. Watson, 39,-362 (La.App.2d Cir.4/20/05), 900 So.2d 325.

. In the interest of judicial economy, such an exhaustive survey will not be repeated here; rather, we refer readers to see the discussion set forth in Carper, supra.

. But see State ex ret D.G., 2008-0938 (La. App. 4th Cir.5/27/10), 40 So.3d 409, writ denied, 2010-1423 (La.9/3/10), 44 So.3d 707, cert. denied, - U.S. -, 131 S.Ct. 1795, 179 L.Ed.2d 664 (2011), where after consideration in light of Melendez-Diaz, supra, the fourth circuit concluded that the victim, who was at the courthouse during the hearing, was "available” and that the defendant’s confrontation rights were not violated even though the prosecution did not call the victim as a witness. This was juvenile proceeding, not a jury trial.

. See State v. Nall, 439 So.2d 420 (La.1983); State v. Pearson, 336 So.2d 833 (La.1976); and State v. Ghoram, 328 So.2d 91 (La.1976).

. See California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); United States v. Owens, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988); Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); Delaware v. Fensterer, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).

. The prosecutor stated in opening arguments that he intended to play the Gingerbread video three times during the trial.